# ADAMO WRECKING CO. *v.* UNITED STATES

No. 76–911.   Argued October 11, 1977—Decided January 10, 1978

*Stanley M. Lipnick* argued the cause for petitioner. With him on the brief were *Burton Y. Weitzenfeld* and *Arthur L. Klein.*

*Frank H. Easterbrook* argued the cause *pro hac vice* for the United States. With him on the brief were *Acting Solicitor General Friedman, Acting Assistant Attorney General Moorman, Raymond N. Zagone, Patrick A. Mulloy, John J. Zimmerman,* and *Gerald K. Gleason.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The Clean Air Act authorizes the Administrator of the Environmental Protection Agency to promulgate "emission standards" for hazardous air pollutants "at the level which in his judgment provides an ample margin of safety to protect the public health." § 112 (b)(1)(B), 84 Stat. 1685, 42 U. S. C. § 1857c–7 (b)(1)(B). The emission of an air pollutant in

violation of an applicable emission standard is prohibited by § 112 (c)(1)(B) of the Act, 42 U. S. C. § 1857c–7 (c)(1)(B). The knowing violation of the latter section, in turn, subjects the violator to fine and imprisonment under the provisions of § 113 (c)(1)(C) of the Act, 42 U. S. C. § 1857c–8 (c)(1)(C) (1970 ed., Supp. V). The final piece in this statutory puzzle is § 307 (b) of the Act, 84 Stat. 1708, 42 U. S. C. § 1857h–5(b) (1970 ed., Supp. V), which provides in pertinent part:

> "(1) A petition for review of action of the Administrator in promulgating . . . any emission standard under section 112 . . . may be filed only in the United States Court of Appeals for the District of Columbia. . . . Any such petition shall be filed within 30 days from the date of such promulgation or approval, or after such date if such petition is based solely on grounds arising after such 30th day.

> "(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement."

It is within this legislative matrix that the present criminal prosecution arose.

Petitioner was indicted in the United States District Court for the Eastern District of Michigan for violation of § 112 (c)(1)(B). The indictment alleged that petitioner, while engaged in the demolition of a building in Detroit, failed to comply with 40 CFR § 61.22 (d)(2)(i) (1975). That regulation, described in its caption as a "National Emission Standard for Asbestos," specifies procedures to be followed in connection with building demolitions, but does not by its terms limit emissions of asbestos which occur during the course of a demolition. The District Court granted petitioner's motion to dismiss the indictment on the ground that no violation of § 112 (c)(1)(B), necessary to establish criminal liability under § 113 (c)(1)(C), had been alleged, because the cited

regulation was not an "emission standard" within the meaning of § 112 (c). The United States Court of Appeals for the Sixth Circuit reversed, 545 F. 2d 1 (1976), holding that Congress had in § 307 (b) precluded petitioner from questioning in a criminal proceeding whether a regulation ostensibly promulgated under § 112 (b)(1)(B) was in fact an emission standard. We granted certiorari, 430 U. S. 953 (1977), and we now reverse.

I

We do not intend to make light of a difficult question of statutory interpretation when we say that the basic question in this case may be phrased: "When is an emission standard not an emission standard?" Petitioner contends, and the District Court agreed, that while the preclusion and exclusivity provisions of § 307 (b) of the Act prevented his obtaining "judicial review" of an emission standard in this criminal proceeding, he was nonetheless entitled to claim that the administrative regulation cited in the indictment was actually not an emission standard at all. The Court of Appeals took the contrary view. It held that a regulation designated by the Administrator as an "emission standard," however different in content it might be from what Congress had contemplated when it authorized the promulgation of emission standards, was sufficient to support a criminal charge based upon § 112 (c), unless it had been set aside in an appropriate proceeding commenced in the United States Court of Appeals for the District of Columbia Circuit pursuant to § 307 (b).

The Court of Appeals in its opinion relied heavily on *Yakus* v. *United States,* 321 U. S. 414 (1944), in which this Court held that Congress in the context of criminal proceedings could require that the validity of regulatory action be challenged in a particular court at a particular time, or not at all. That case, however, does not decide this one. Because § 307 (b) expressly applies only to "emission standards," we must still inquire as to the validity of the Government's underlying

assumption that the Administrator's mere designation of a regulation as an "emission standard" is sufficient to foreclose any further inquiry in a criminal prosecution under § 113 (c) (1)(C) of the Act. For the reasons hereafter stated, we hold that one such as respondent who is charged with a criminal violation under the Act may defend on the ground that the "emission standard" which he is charged with having violated was not an "emission standard" within the contemplation of Congress when it employed that term, even though the "emission standard" in question has not been previously reviewed under the provisions of § 307 (b) of the Act.

## II

In resolving this question, we think the statutory provisions of the Clean Air Act are far less favorable to the Government's position than were the provisions of the Emergency Price Control Act considered in *Yakus*. The broad language of that statute gave clear evidence of congressional intent that *any* actions taken by the Price Administrator under the purported authority of the designated sections of the Act should be challenged only in the Emergency Court of Appeals. Nothing has been called to our attention which would lead us to disagree with the Government's description of the judicial review provisions of that Act:

> "Review of price control regulations was centralized in the Emergency Court of Appeals under a statute giving that court 'exclusive' jurisdiction of all non-constitutional challenges to price control regulations. The Court had no difficulty construing the statute as precluding any attack on a regulation in a criminal case (321 U. S., at 430–431), even though the statute did not explicitly mention criminal cases." Brief for United States 18.

This relatively simple statutory scheme contrasts with the Clean Air Act's far more complex interrelationship between the imposition of criminal sanctions and judicial review of the

Administrator's actions.  The statutory basis for imposition of criminal liability under subchapter I of the Act, under which this indictment was brought, is § 113 (c)(1), 84 Stat. 1687, as amended, 42 U. S. C. § 1857c–8 (c)(1) (1970 ed. and Supp. V):

"(c)(1)  Any person who knowingly—

"(A)  violates any requirement of an applicable implementation plan (i) during any period of Federally assumed enforcement, or (ii) more than 30 days after having been notified by the Administrator under subsection (a)(1) that such person is violating such requirement, or

"(B)  violates or fails or refuses to comply with any order issued by the Administrator under subsection (a), or

"(C)  violates section 111 (e), section 112 (c), or section 119 (g)

"shall be punished by a fine of not more than $25,000 per day of violation, or by imprisonment for not more than one year, or by both.  If the conviction is for a violation committed after the first conviction of such person under this paragraph, punishment shall be by a fine of not more than $50,000 per day of violation, or by imprisonment for not more than two years, or by both."

Each of the three separate subsections in the quoted language creates criminal offenses.  The first of them, subsection (A), deals with violations of applicable implementation plans after receipt of notice of such violation.  Under § 307 (b)(1), judicial review of the Administrator's action in approving or promulgating an implementation plan is not restricted to the Court of Appeals for the District of Columbia Circuit, but may be had "in the United States Court of Appeals for the appropriate circuit."  But § 307 (b)(2) does provide that the validity of such plans may not be reviewed in the criminal proceeding itself.

Subsection (C), which we discuss before turning to subsection (B), provides criminal penalties for violations of three

separate sections of the Act: § 111 (e), 84 Stat. 1684, 42 U. S. C. § 1857c–6 (e), which prohibits operation of new stationary sources in violation of "standards of performance" promulgated by the Administrator; § 112 (c), which is the offense charged in this case; and § 119 (g), 88 Stat. 254, 42 U. S. C. § 1857c–10 (g) (1970 ed., Supp. V),[1] which requires compliance with an assortment of administrative requirements, set out in more detail below. The Administrator's actions in promulgating "standards of performance" under § 111, or "emission standards" under § 112 are, by the provisions of § 307 (b)(1), made reviewable exclusively in the Court of Appeals for the District of Columbia Circuit. However, his actions under subsections (A), (B), and (C) of § 119 (c)(2), compliance with which is required by § 119 (g)(2), are reviewable "in the United States Court of Appeals for the appropriate circuit." Those subsections define the Administrator's authority to issue compliance date extensions to particular stationary sources with regard to various air pollution requirements. The preclusive provisions of § 307 (b)(2) prohibit challenges to all of *these* administrative actions in both civil and criminal enforcement proceedings. But these restrictive review provisions do *not* apply to *other* violations of § 119 (g); with regard to those offenses, the invalidity of administrative action may be raised as a defense to the extent allowable in the absence of such restrictions.

Finally, subsection (B) of § 113 (c)(1) subjects to criminal penalties "any person who knowingly . . . violates or fails or refuses to comply with any order issued by the Administrator under subsection (a)." Subsection (a), in turn, empowers the Administrator to issue orders requiring compliance, not only with those regulations for which criminal penalties are provided under subsections (A) and (C), but also with the record-keeping and inspection requirements of § 114, 42 U. S. C.

---

[1] Section 119, which was in effect at the inception of this prosecution, has lately been replaced by a new § 113 (d). Clean Air Act Amendments of 1977, Pub. L. 95–95, § 112, 91 Stat. 705.

§ 1857c–9 (1970 ed., Supp. V), for which only civil penalties are ordinarily available under § 113 (b)(4). The restrictive review provisions of § 307 (b)(1), again do *not* apply to orders issued under § 113 (a) or to the underlying requirements of § 114. Those administrative actions would likely be reviewable under the Administrative Procedure Act, 5 U. S. C. § 701 *et seq.,* and any infirmity in them could be raised as a defense in enforcement proceedings to the same extent as it could be in the absence of a provision such as § 307 (b)(2).

## III

The conclusion we draw from this excursion into the complexities of the criminal sanctions provided by the Act are several. First, Congress has not chosen to prescribe *either* civil or criminal sanctions for violations of *every* rule, regulation, or order issued by the Administrator. Second, Congress, as might be expected, has imposed *civil* liability for a wider range of violations of the orders of the Administrator than those for which it has imposed *criminal* liability. Third, even where Congress has imposed criminal liability for the violation of an order of the Administrator, it has not uniformly precluded judicial challenge to the order as a defense in the criminal proceeding. Fourth, although Congress has applied the preclusion provisions of § 307 (b)(2) to implementation plans approved by the Administrator, and it has in § 113 (c)(1)(A) provided criminal penalties for violations of those plans, it has nonetheless required, under normal circumstances, that a violation continue for a period of 30 days after receipt of notice of the violation from the Administrator before the criminal sanction may be imposed.

These conclusions in no way detract from the fact that Congress *has* precluded judicial review of an "emission standard" in the court in which the criminal proceeding for the violation of the standard is brought. Indeed, the conclusions heighten the importance of determining what it was that Congress meant by an "emission standard," since a violation of

*that* standard is subject to the most stringent criminal liability imposed by § 113 (c)(1) of the Act: Not only is the Administrator's promulgation of the standard not subject to judicial review in the criminal proceeding, but no prior notice of violation from the Administrator is required as a condition for criminal liability.[2] Since Congress chose to attach these stringent sanctions to the violation of an emission standard, in contrast to the violation of various other kinds of orders that might be issued by the Administrator, it is crucial to determine whether the Administrator's mere designation of a regulation as an "emission standard" is conclusive as to its character.

The stringency of the penalty imposed by Congress lends substance to petitioner's contention that Congress envisioned a particular type of regulation when it spoke of an "emission standard." The fact that Congress dealt more leniently, either in terms of liability, of notice, or of available defenses, with other infractions of the Administrator's orders suggests that it attached a peculiar importance to compliance with "emission standards." Unlike the situation in *Yakus,* Congress in the Clean Air Act singled out violators of this generic form of regulation, imposed criminal penalties upon them which would not be imposed upon violators of other orders of the Administrator, and precluded them from asserting defenses which might be asserted by violators of other orders of the Administrator. All of this leads us to conclude that Congress intended, within broad limits, that "emission standards" be regulations of a certain type, and that it did not empower the Administrator, after the manner of Humpty Dumpty in Through the Looking-Glass, to make a regulation an "emission standard" by his mere designation.

---

[2] The severity of the scheme is accentuated by the fact that persons subject to the Act, including innumerable small businesses, may protect themselves against arbitrary administrative action only by daily perusal of proposed emission standards in the Federal Register and by immediate initiation of litigation in the District of Columbia to protect their interests.

The statutory scheme supports the conclusion that § 307 (b)(2), in precluding judicial review of the validity of emission standards, does not relieve the Government of the duty of proving, in a prosecution under § 113 (c)(1)(C), that the regulation allegedly violated is an emission standard. Here, the District Court properly undertook to resolve that issue. In so doing, the court did not undermine the twin congressional purposes of insuring that the substantive provisions of the standard would be uniformly applied and interpreted and that the circumstances of its adoption would be quickly reviewed by a single court intimately familiar with administrative procedures. The District Court did not presume to judge the wisdom of the regulation or to consider the adequacy of the procedures which led to its promulgation, but merely concluded that it was not an emission standard.[3]

In sum, a survey of the totality of the statutory scheme does not compel agreement with the Government's contention that Congress intended that the Administrator's designation of a regulation as an emission standard should be conclusive in a criminal prosecution. At the very least, it may be said that

---

[3] Such a preliminary analysis of administrative action is hardly unique. Only last Term, in *E. I. du Pont de Nemours & Co.* v. *Train*, 430 U. S. 112 (1977), this Court approved such an initial examination of regulations promulgated under the Federal Water Pollution Control Act. As we described the issue presented there:

"If EPA is correct that its regulations are 'effluent limitation[s] under section 301,' the regulations are directly reviewable in the Court of Appeals. If industry is correct that the regulations can only be considered § 304 guidelines, suit to review the regulations could probably be brought only in the District Court, if anywhere. Thus, the issue of jurisdiction to review the regulations is intertwined with the issue of EPA's power to issue the regulations." *Id.*, at 124–125.

In that case, the District Court had conducted a careful analysis, concluding that the regulations in question were "effluent limitations," 383 F. Supp. 1244 (WD Va. 1974), aff'd, 528 F. 2d 1136 (CA4 1975), just as the District Court here concluded that this regulation is not an emission standard.

the issue is subject to some doubt. Under these circumstances, we adhere to the familiar rule that, "where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant." *United States* v. *Bass,* 404 U. S. 336, 348 (1971). Cf. *Rewis* v. *United States,* 401 U. S. 808, 812 (1971).

We conclude, therefore, that a federal court in which a criminal prosecution under § 113 (c)(1)(C) of the Clean Air Act is brought may determine whether or not the regulation which the defendant is alleged to have violated is an "emission standard" within the meaning of the Act. We are aware of the possible dangers that flow from this interpretation; district courts will be importuned, under the guise of making a determination as to whether a regulation is an "emission standard," to engage in judicial review in a manner that is precluded by § 307 (b)(2) of the Act. This they may not do. The narrow inquiry to be addressed by the court in a criminal prosecution is not whether the Administrator has complied with appropriate procedures in promulgating the regulation in question, or whether the particular regulation is arbitrary, capricious, or supported by the administrative record. Nor is the court to pursue any of the other familiar inquiries which arise in the course of an administrative review proceeding. The question is only whether the regulation which the defendant is alleged to have violated is on its face an "emission standard" within the broad limits of the congressional meaning of that term.

IV

It remains to be seen whether the District Court reached the correct conclusion with regard to the regulation here in question. In the Act, Congress has given a substantial indication of the intended meaning of the term "emission standard." Section 112 on its face distinguishes between emission standards and the techniques to be utilized in achieving those standards. Under § 112 (c)(1)(B)(ii), the Administrator is empowered temporarily to exempt certain facilities

from the burden of compliance with an emission standard, "if he finds that such period is necessary for the installation of controls." In specified circumstances, the President, under § 112 (c)(2), has the same power, "if he finds that the technology to implement such standards is not available." Section 112 (b)(2) authorizes the Administrator to issue information on "pollution control techniques."

Most clearly supportive of petitioner's position that a standard was intended to be a quantitative limit on emissions is this provision of § 112 (b)(1)(B): "The Administrator shall establish any such standard *at the level* which in his judgment provides an ample margin of safety to protect the public health from such hazardous air pollutant." (Emphasis added.) All these provisions lend force to the conclusion that a standard is a quantitative "level" to be attained by use of "techniques," "controls," and "technology." This conclusion is fortified by recent amendments to the Act, by which Congress authorized the Administrator to promulgate a "design, equipment, work practice, or operational standard" when "it is not feasible to prescribe or enforce an emission standard." Clean Air Act Amendments of 1977, Pub. L. 95–95, § 110, 91 Stat. 703.[4]

This distinction, now endorsed by Congress, between "work practice standards" and "emission standards" first appears in the Administrator's own account of the development of this regulation. Although the Administrator has contended that a "work practice standard" is just another type of emission standard, the history of this regulation demonstrates that he

---

[4] Since oral argument, Congress has again confirmed that the term "emission standard" is not broad enough to include a work-practice standard. Congress has amended § 307 (b)(1), which originally governed review of "any emission standard under section 112," to cover "any emission standard or requirement under section 112." Pub. L. No. 95–190, § 14 (a)(79), 91 Stat. 1404. As MR. JUSTICE STEVENS' dissent notes, *post,* at 306, Congress has yet to apply this recognition to the enforcement provisions of § 112 (c).

chose to regulate work practices only when it became clear he could not regulate emissions. The regulation as originally proposed would have prohibited all visible emissions of asbestos during the course of demolitions. 36 Fed. Reg. 23242 (1971). In adopting the final form of the regulation, the Administrator concluded "that the no visible emission requirement would prohibit repair or demolition in many situations, since it would be impracticable, if not impossible, to do such work without creating visible emissions." 38 Fed. Reg. 8821 (1973). Therefore the Administrator chose to "specif[y] certain work practices" instead. *Ibid.*

The Government concedes that, prior to the 1977 Amendments, the statute was ambiguous with regard to whether a work-practice standard was properly classified as an emission standard, but argues that this Court should defer to the Administrator's construction of the Act.[5] Brief for United

---

[5] Our Brother STEVENS quite correctly points out, *post,* at 302, that an administrative " 'contemporaneous construction' " of a statute is entitled to considerable weight, and it is true that the originally proposed regulations contain, with respect to some uses of asbestos, the sort of provisions which the Administrator and the Congress later designated as "work practice standards." It bears noting, however, that these regulations can only be said to define *by implication* the meaning of the term "emission standard." The Administrator promulgated both of them; both were denominated "emission standards"; and it is undoubtedly a fair inference that the Administrator thought each to be an "emission standard." But neither the regulations themselves nor the comments accompanying them give any indication of the Administrator's reasons for concluding that Congress, in authorizing him to promulgate "emission standards," intended to include "work practice standards" within the meaning of that term. See 38 Fed. Reg. 8820–8822, 8829–8830 (1973); 36 Fed. Reg. 23239–23240, 23242 (1971).

This lack of specific attention to the statutory authorization is especially important in light of this Court's pronouncement in *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944), that one factor to be considered in giving weight to an administrative ruling is "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." The Administrator's remarks with regard to

States 32, and n. 22. While such deference is entirely appropriate under ordinary circumstances, in this case the 1977 Amendments to the Clean Air Act tend to undercut the

these regulations clearly demonstrate that he carefully considered available techniques and methods for controlling asbestos emissions, but they give no indication of "the validity of [his] reasoning" in concluding that he was authorized to promulgate these techniques as an "emission standard," within the statutory definition. Since this Court can only speculate as to his reasons for reaching that conclusion, the mere promulgation of a regulation, without a concomitant exegesis of the statutory authority for doing so, obviously lacks "power to persuade" as to the existence of such authority.

By contrast, the Wage and Hour Administrator in *Gemsco, Inc.* v. *Walling,* 324 U. S. 244 (1945), referred to in Brother STEVENS' dissenting opinion, *post,* at 299–300, n. 16, gave clear indication of his reasons for concluding that the administrative regulation prohibiting industrial homework was authorized by § 8 (f) of the Fair Labor Standards Act, 52 Stat. 1065. The statute empowered the Administrator to issue orders necessary "to prevent the circumvention or evasion" of orders issued under § 8 (f), and the Administrator specifically found that the practice prohibited by the order there challenged " 'furnishe[d] a ready means of circumventing or evading the minimum wage order for this Industry.' " 324 U. S., at 250, n. 9. In this case, the Administrator of the Environmental Protection Agency offered no comparable analysis of his statutory authority.

In *Train* v. *Natural Resources Defense Council,* 421 U. S. 60 (1975), relied upon by Brother STEVENS' dissent, this Court was not persuaded by "a single sentence in the Federal Register," *post,* at 301 n. 18, but by our own "analysis of the structure and legislative history of the Clean Air Amendments," 421 U. S., at 86, which led us to a result consistent with the Administrator's prior practice. Here, our analysis mandates a contrary conclusion, which is not undercut by the Administrator's unexplained exercise of supposed authority.

Finally, as noted in n. 4, *supra,* Congress has not explicitly adopted the Administrator's present position with regard to the meaning of the term "emission standard," although it could easily have done so. It is true, as that dissent remarks, *post,* at 305–306, n. 24, that Congress has responded to concerns expressed by the Administrator. However, he first advised us of the deficiency in § 307 (b) at oral argument, and even then did not suggest that under the statutory scheme as it presently exists his work-practice standards may be unenforceable. This piecemeal

administrative construction. The Senate Report reiterated its "strong preference for numerical emission limitations," but endorsed the addition of § 112 (e) to the Act to allow the use of work-practice standards "in a very few limited cases." S. Rep. No. 95–127, p. 44 (1977). Although the Committee agreed that the Amendments would authorize the regulation involved here, it refrained from endorsing the Administrator's view that the regulation had previously been authorized as an emission standard under § 112 (c). The clear distinction drawn in § 112 (e) between work-practice standards and emission standards practically forecloses any such inference. Cf. *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 380–381 (1969).

For all of the foregoing reasons, we conclude that the work-practice standard involved here was not an emission standard. The District Court's order dismissing the indictment was therefore proper, and the judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE POWELL, concurring.

If the constitutional validity of § 307 (b) of the Clean Air Act had been raised by petitioner, I think it would have merited serious consideration. This section limits judicial review to the filing of a petition in the United States Court of Appeals for the District of Columbia Circuit within 30 days from the date of the promulgation by the Administrator of an emission standard. No notice is afforded a party who may be subject to criminal prosecution other than publication of the Administrator's action in the Federal Register.[1] The Act in

---

approach to the complexities of the Act hardly displays the "thoroughness . . . in . . . consideration," *Skidmore, supra,* at 140, which we would expect to find in an administrative construction.

[1] Section 112 (b) (1) (B) of the Act requires the Administrator to publish proposed emission standards and to hold a public hearing before standards

this respect is similar to the preclusion provisions of the Emergency Price Control Act before the Court in *Yakus* v. *United States,* 321 U. S. 414 (1944), and petitioner may have thought the decision in that case effectively foreclosed a due process challenge in the present case.

Although I express no considered judgment, I think *Yakus* is at least arguably distinguishable. The statute there came before the Court during World War II, and it can be viewed as a valid exercise of the war powers of Congress under Art. I, § 8, of the Constitution. Although the opinion of Mr. Chief Justice Stone is not free from ambiguity, there is language emphasizing that the price controls imposed by the Congress were a "war emergency measure." Indeed, the Government argued that the statute should be upheld under the war powers authority of Congress. Brief for United States in *Yakus* v. *United States,* O. T. 1943, No. 374, p. 35. As important as environmental concerns are to the country, they are not comparable—in terms of an emergency justifying the shortcutting of normal due process rights—to the need for national mobilization in wartime of economic as well as military activity.

The 30-day limitation on judicial review imposed by the Clean Air Act would afford precariously little time for many affected persons even if some adequate method of notice were afforded. It also is totally unrealistic to assume that more than a fraction of the persons and entities affected by a regulation—especially small contractors scattered across the country—would have knowledge of its promulgation or familiarity with or access to the Federal Register. Indeed, following *Yakus,* and apparently concerned by Mr. Justice Rutledge's

---

are promulgated. But there is no more assurance that notice of proposed standards will come to the attention of the thousands of persons and entities affected than that notice of their actual promulgation will. Neither is it realistic to assume that more than a fraction of these persons and entities could afford to follow or participate in the Administrator's hearing.

eloquent dissent, Congress amended the most onerous features of the Emergency Price Control Act.[2]

I join the Court's opinion with the understanding that it implies no view as to the constitutional validity of the preclusion provisions of § 307 (b) in the context of a criminal prosecution.

Mr. Justice Stewart, with whom Mr. Justice Brennan and Mr. Justice Blackmun join, dissenting.

Section 307 (b)(1) of the Clean Air Act provides that a "petition for review of action of the Administrator in promulgating . . . any emission standard under section 112" may be filed only in the United States Court of Appeals for the District of Columbia Circuit within 30 days of promulgation. Section 307 (b)(2) of the Act provides that an "[a]ction of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement." Despite these unambiguous provisions, the Court holds in this case that such an action of the Administrator *shall* be subject to judicial review in a criminal proceeding for enforcement of the Act, at least sometimes. Because this tampering with the plain statutory language threatens to destroy the effectiveness of the unified and expedited judicial review procedure established by Congress in the Clean Air Act, I respectfully dissent.

The inquiry that the Court today allows a trial court to make—whether the asbestos regulation at issue is an emission standard of the type envisioned by Congress—is nothing more than an inquiry into whether the Administrator has acted beyond his statutory authority. But such an inquiry is a normal part of judicial review of agency action. 5 U. S. C. § 706 (2)(C); see *Citizens to Preserve Overton Park* v. *Volpe,*

---

[2] See 321 U. S., at 460 (Rutledge, J., dissenting); 58 Stat. 638–640, amending the Emergency Price Control Act of 1942, 56 Stat. 23; L. Jaffe, Judicial Control of Administrative Action 451 (1965).

401 U. S. 402, 415. And it is precisely such "judicial review" of an "[a]ction of the Administrator" that Congress has, in § 307 (b)(2), expressly *forbidden* a trial court to undertake. There is not the slightest indication in the Act or in its legislative history that Congress, in providing for review of the Administrator's actions only in the Court of Appeals for the District of Columbia Circuit, meant nonetheless to allow some kinds of review to be available in other courts. To the contrary, Congress clearly ordained that *"any* review of such actions" be controlled by the provisions of § 307. S. Rep. No. 91–1196, p. 41 (1970) (emphasis supplied).

The Court's interpretation of § 307 (b)(2) also conspicuously frustrates the intent of Congress to establish a speedy and unified system of judicial review under the Act. The Court concludes that violation of the regulation involved in this case is not proscribed by §§ 112 (c)(1)(B) and 113 (c)(1) (C) because the regulation is not an emission standard. This interpretation of the Act would make judicial review of this regulation in the Court of Appeals for the District of Columbia Circuit impossible, since that court has statutory jurisdiction under § 307 (b)(1) to review "emission standard[s]" but is not given jurisdiction to review the actions of the Administrator generally. It follows that judicial review of this action of the Administrator could be had *only* in other courts, either in enforcement proceedings as in this case or under the general provisions of the Administrative Procedure Act, 5 U. S. C. § 701 *et seq.,* despite the clearly expressed congressional intent to centralize all judicial review of the Administrator's regulations. The Court's interpretation thus not only invites precisely the sort of inconsistent judicial determinations by various courts that Congress sought to prevent, but flies in the face of the congressional purpose "to maintain the integrity of the time sequences provided throughout the Act." S. Rep. No. 91–1196, *supra,* at 41.

Finally, the Court provides no real guidance as to which

aspects of an emission standard are so critical that they fall outside the scope of the exclusive judicial review procedure provided by Congress. For example, § 112 requires that an emission standard relate to a "hazardous air pollutant," and that it be set so as to provide "an ample margin of safety to protect the public health." Such express congressional mandates would seem at least as important in determining whether a regulation is a statutorily authorized emission standard as the supposed requirement that the regulation be numerical in form. Are issues such as these, therefore, now to be subject to review in trial court enforcement proceedings? The Court today has allowed the camel's nose into the tent, and I fear that the rest of the camel is almost certain to follow.

Since I believe that the Administrator's action in promulgating this regulation could have been reviewed in the Court of Appeals for the District of Columbia Circuit under § 307 (b)(1), and that such review could have included the petitioner's claim that the Administrator's action was beyond his authority under the Act, I would hold that the petitioner was barred by the express language of § 307 (b)(2) from raising that issue in the present case.*

MR. JUSTICE STEVENS, dissenting.

The reason Congress attached "the most stringent criminal liability," *ante*, at 283, to the violation of an emission standard for a "hazardous air pollutant" is that substances within that narrow category pose an especially grave threat to human health. That is also a reason why the Court should avoid a construction of the statute that would deny the Administrator the authority to regulate these poisonous substances effectively.

---

*Because the petitioner has not raised any constitutional challenge in this case, there is no occasion to consider what limits, if any, the Due Process Clause of the Fifth Amendment imposes on the power of Congress to qualify or foreclose judicial review of agency action.

The reason the Administrator did not frame the emission standard for asbestos in numerical terms is that asbestos emissions cannot be measured numerically. For that reason, if Congress simultaneously commanded him (a) to regulate asbestos emissions by establishing and enforcing emission standards and (b) never to use any kind of standard except one framed in numerical terms, it commanded an impossible task.

Nothing in the language of the 1970 statute, or in its history, compels so crippling an interpretation of the Administrator's authority. On the contrary, I am persuaded (1) that the Administrator's regulation of asbestos emissions was entirely legitimate; (2) that if this conclusion were doubtful, we would nevertheless be required to respect his reasonable interpretation of the governing statute; (3) that the 1977 Amendments, fairly read, merely clarified his pre-existing authority; and (4) that the Court's reading of the statute in its current form leads to the anomalous conclusion that work-practice rules, even though properly promulgated, are entirely unenforceable. Accordingly, although I agree with the conclusions reached in Parts I, II, and III of the Court's opinion, I cannot accept Part IV's disposition of the most important issue in this case.[1]

I

The regulation which petitioner is accused of violating requires that asbestos insulation and fireproofing in large

---

[1] Nor can I join MR. JUSTICE STEWART's opinion, because he does not explain what test he applies to determine that § 307 (b) precludes any challenge to the asbestos regulation in an enforcement proceeding. The preclusion provision applies only if the Administrator's action could have been reviewed in the Court of Appeals for the District of Columbia Circuit; and review was not available there unless the Administrator's "action" was the promulgation of an "emission standard" within the meaning of § 307 (b). In short, MR. JUSTICE STEWART's dissent rests either on the unarticulated premise that the asbestos regulation was an "emission standard" under § 307 (b), or on the application of a test not to be found in the language of the statute.

buildings be watered down before the building is demolished.[2]
The effect of the regulation is to curtail the quantity of
asbestos which is emitted into the open air during demolition.
Because neither the rule nor its limiting effect is expressed in
numerical terms, the Court holds that the asbestos regulation
cannot be a "standard" within the meaning of § 112 (b)(1)
of the Clean Air Act.[3]  This conclusion is not compelled by
the use of the word "standard"[4] or by Congress' expectation

---

[2] The emission standard for asbestos provides, in pertinent part:

"(i) Friable asbestos materials, used to insulate or fireproof any boiler,
pipe, or load-supporting structural member, shall be wetted and removed
from any building, structure, facility, or installation subject to this para-
graph before wrecking of load-supporting structural members is commenced.
The friable asbestos debris shall be wetted adequately to insure that such
debris remains wet during all stages of demolition and related handling
operations."  40 CFR § 61.22 (d)(2)(i) (1975).

[3] Section 112 (b)(1) provides:

"(A) The Administrator shall, within 90 days after the date of enact-
ment of the Clean Air Amendments of 1970, publish (and shall from time
to time thereafter revise) a list which includes each hazardous air pollutant
for which he intends to establish an emission standard under this section.

"(B) Within 180 days after the inclusion of any air pollutant in such
list, the Administrator shall publish proposed regulations establishing
emission standards for such pollutant together with a notice of a public
hearing within thirty days.  Not later than 180 days after such publication,
the Administrator shall prescribe an emission standard for such pollutant,
unless he finds, on the basis of information presented at such hearings, that
such pollutant clearly is not a hazardous air pollutant.  The Administrator
shall establish any such standard at the level which in his judgment provides
an ample margin of safety to protect the public health from such hazardous
air pollutant.

"(C) Any emission standard established pursuant to this section shall
become effective upon promulgation."  84 Stat. 1685, 42 U. S. C. § 1857c–7
(b)(1).

[4] There is no semantic reason why the word "standard" may not be used
to describe the watered-down asbestos standard involved in this case.
Indeed, the Court itself has previously identified a "watered down standard"
that is not expressed in numerical terms, see *Benton* v. *Maryland,* 395 U. S.
784, 796.

that standards would normally be expressed in numerical terms; for the statute contains no express requirement that standards *always* be framed in such language. The question is simply whether § 112 (b), which directs the Administrator to adopt regulations establishing emission standards for hazardous air pollutants, granted him the authority to promulgate the asbestos standard challenged in this case.

Section 112 is concerned with a few extraordinarily toxic pollutants. Only three substances, including asbestos, have been classified as "hazardous air pollutants" within the meaning of § 112.[5] These pollutants are subject to special federal regulation. In § 112, Congress ordered the Administrator to identify and to regulate them without waiting for the States to develop implementation plans of their own. Thus, the procedure under § 112 contrasts markedly with the more leisurely and decentralized process of setting and enforcing the general ambient air standards.[6] Congress was gravely concerned about the poisonous character of asbestos emissions when it drafted § 112.[7] In fact, with regard to the hazardous air pollutants covered by this section, Congress expressed its willingness to accept the prospect of plant closings: "The standards must be set to provide an ample margin of safety to protect the public health. This could mean, effectively, that a plant would be required to close because of the absence of control techniques. It could include emission standards which allowed for no measurable emissions." [8]

---

[5] See 40 CFR § 61 (1975).

[6] Compare § 112, 42 U. S. C. § 1857c–7, with §§ 109 and 110, 42 U. S. C. §§ 1857c–4 and 1857c–5 (1970 ed. and Supp. V).

[7] See, *e. g.*, National Air Quality Standards Act of 1970, S. Rep. No. 91–1196, p. 20 (1970).

[8] This statement was made in a written summary of the conference agreement presented by Senator Muskie to the Senate, which then agreed to the Conference Report. Summary of the Provisions of Conference Agreement on the Clean Air Amendments of 1970, reprinted in Senate Committee on Public Works, A Legislative History of the Clean Air

In accord with Congress' expectation, the Administrator promptly listed asbestos as a hazardous air pollutant,[9] and published a proposed emission standard. As first proposed, the standard would have prohibited any visible emission of asbestos in connection with various activities, including the repair or demolition of commercial and apartment buildings.[10]

If that total prohibition had been adopted, it unquestionably would have conformed to the statutory mandate. It was not adopted, however, because industry convinced the Administrator that his proposal would prevent the demolition of any large building.[11] At public hearings it was demonstrated that

Amendments of 1970, 93d Cong., 2d Sess., 133 (Comm. Print 1974). See also *id.*, at 150.

[9] 36 Fed. Reg. 5931 (1971). The three hazardous air pollutants—asbestos, beryllium, and mercury—listed by the Administrator on March 29, 1971, were all identified in the legislative history.

The Administrator's investigation fully supported Congress' suspicion that asbestos was an intolerably dangerous pollutant. Among other risks, even low-level or intermittent exposure to asbestos can cause cancer 20 or 30 years after the event. 38 Fed. Reg. 8820 (1973). For example, a form of cancer usually found almost exclusively in asbestos workers killed a woman whose only contact with the pollutant was washing the workclothes of her children, who worked for an asbestos company. See Horvitz, Asbestos and Its Environmental Impact, 3 Environmental Affairs 145, 146 (1974).

[10] "(d) Visible emissions to the atmosphere of asbestos particulate matter resulting from the repair or demolition of any building or structure, other than a single-family dwelling are prohibited." 36 Fed. Reg. 23242 (1971).

[11] The Administrator explained:

"The proposed standard would have prohibited visible emissions of asbestos particulate material from the repair or demolition of any building or structure other than a single-family dwelling. Comments indicated that the no visible emission requirement would prohibit repair or demolition in many situations, since it would be impracticable, if not impossible, to do such work without creating visible emissions. Accordingly, the promulgated standard specifies certain work practices which must be followed when demolishing certain buildings or structures. The standard covers institutional, industrial, and commercial buildings or structures, including apartment houses having more than four dwelling units, which contain friable asbestos material." 38 Fed. Reg. 8821 (1973).

demolition inevitably causes some emission of particulate asbestos and, further, that these emissions cannot be measured. Accordingly, instead of the severe numerical standard of zero emissions—which might have put an entire industry out of business—the Administrator adopted a standard which would reduce the emission of asbestos without totally prohibiting it. Not a word in the Administrator's long and detailed explanation of the standard indicates that anyone questioned his statutory authority to promulgate this type of emission standard.[12]

The promulgated standard is entirely consistent with congressional intent. Congress had indicated a preference for numerical emission standards.[13] Congress had also expressed a willingness to accept the serious economic hardships that a total prohibition of asbestos emissions would have caused. But there is no evidence that Congress intended to require the Administrator to make a choice between the extremes of closing down an entire industry and imposing no regulation on the emission of a hazardous pollutant; Congress expressed no overriding interest in using a numerical standard when industry is able to demonstrate that a less drastic control tech-

---

[12] There was no review of the emission standard for asbestos in the United States Court of Appeals for the District of Columbia Circuit. An untimely petition for review was dismissed without any decision on the merits. *Dore Wrecking Co.* v. *Fri,* No. 73–1686 (CADC, Aug. 1, 1973). Contrary to the implication in n. 2 of the Court's opinion, this case does not raise any question about fair notice to small businesses. The wrecking company prosecuted here was individually notified about the wetting requirement and individually responded to the notice by promising to comply fully with the regulation on all future jobs. Indeed, the company's response specifically named the location, where, according to the indictment, it subsequently committed a knowing violation of the regulation.

[13] Congress apparently believed that too frequent resort to work-practice rules or equipment specifications would discourage the private market's pursuit of "the most economic, acceptable technique to apply." S. Rep. No. 91–1196, at 17.

nique is available,[14] and that it provides an ample margin of safety to the public health.[15]

Admittedly, Congress did not foresee the Administrator's dilemma with precision. But there is nothing unique about that circumstance. See, *e. g., Mourning* v. *Family Publications Serv., Inc.*, 411 U. S. 356, 372–373. Indeed, there would be no need for interstitial administrative lawmaking if Congress could foresee every ramification of laws as complex as this.[16] I am persuaded that the Administrator's solution

---

[14] A summary of the conference agreement states that § 112 "could mean, effectively, that a plant would be required to close because of the absence of control techniques." See text accompanying n. 8, *supra.* This statement implies that the Administrator should avoid setting emission standards that will require plant closings if alternative control techniques—including work-practice rules—can provide an ample margin of safety. It is unlikely that Congress intended, by expressing a modest preference for numerical standards, see n. 11, *supra,* to mandate plant closings under a numerical standard when a work-practice rule would achieve the same level of protection with less economic disruption.

[15] "[T]he Administrator has determined that, in order to provide an ample margin of safety to protect the public health from asbestos, it is necessary to control emissions from major man-made sources of asbestos emissions into the atmosphere, but that it is not necessary to prohibit all emissions." 38 Fed. Reg. 8820 (1973).

[16] In *Gemsco, Inc.* v. *Walling,* 324 U. S. 244, this Court approved a much more dubious substitute for a regulation that Congress surely expected to be framed in numerical terms. In that case the Administrator of the Fair Labor Standards Act decided to ban industrial homework as a way of enforcing the minimum wage. If homework were allowed to continue, the Administrator concluded, industry could readily evade wage standards. Although the Administrator lacked any express authority to regulate industrial homework, this Court approved his action, saying:

"The industry is covered by the Act. This is not disputed. The intent of Congress was to provide the authorized minimum wage for each employee so covered. Neither is this questioned. Yet it is said in substance that Congress at the same time intended to deprive the Administrator of the only means available to make its mandate effective. The construction sought would make the statute a dead letter in this industry.

"The statute itself thus gives the answer. It does so in two ways, by

was faithful to his statutory authority and that he would have misused his power if he had either failed to regulate asbestos emissions at all or unnecessarily demolished an entire industry.

## II

The precise question presented to this Court is not whether, as an initial matter, we would regard the asbestos regulation as an "emission standard" within the meaning of § 112. Rather, the issue is whether the Administrator's answer to the question of statutory construction is "sufficiently reasonable that it should have been accepted by the reviewing courts." *Train* v. *Natural Resources Defense Council,* 421 U. S. 60, 75.

The Administrator, who has primary responsibility for carrying out the purposes of the Clean Air Act, interpreted the term "emission standard" to include the rule before us. Contrary to the Court's implication, *ante,* at 287, the Administrator did not promulgate this rule "instead" of an emission standard. He unambiguously concluded that the rule was a proper emission standard.[17]

---

necessity to avoid self-nullification and by its explicit terms. The necessity should be enough. But the Act's terms reinforce the necessity's teaching. Section 8 (d) requires the Administrator to 'carry into effect' the committee's approved recommendations. Section 8 (f) commands him to include in the order 'such terms and conditions' as he 'finds necessary to carry out' its purposes. . . . When command is so explicit and, moreover, is reinforced by necessity in order to make it operative, nothing short of express limitation or abuse of discretion in finding that the necessity exists should undermine the action taken to execute it." *Id.,* at 254–255.

In the present case, necessity also demanded the promulgation of a work-practice rule if Congress' purposes were to be carried out at a cost acceptable to the Nation. Furthermore, the Administrator of the Environmental Protection Agency has similar powers "to prescribe such regulations as are necessary to carry out his functions under this chapter." § 301, 42 U. S. C. § 1857g (a).

[17] In promulgating the wetting requirement, the Administrator consistently referred to it as an emission standard:

"[T]he promulgated standard specifies certain work practices which must

Because the statute is the Administrator's special province, we should not lightly set aside his judgment. "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' " *Udall* v. *Tallman*, 380 U. S. 1, 16.[18]

---

be followed when demolishing certain buildings or structures. The standard covers institutional, industrial, and commercial buildings or structures . . . . The standard requires that the Administrator be notified at least 20 days prior to the commencement of demolition." 38 Fed. Reg. 8821 (1973).

[18] In a recent case dealing with the proper construction of the Clean Air Act, the Court deferred to the view of the Administrator:

"Without going so far as to hold that the Agency's construction of the Act was the only one it permissibly could have adopted, we conclude that it was at the very least sufficiently reasonable that it should have been accepted by the reviewing courts." *Train* v. *Natural Resources Defense Council*, 421 U. S. 60, 75.

See also *McLaren* v. *Fleischer*, 256 U. S. 477, 480–481. The Court rejects the Administrator's view because his "mere promulgation of a regulation" lacks power to persuade. *Ante,* at 288 n. 5. We have not previously required that judicial-style opinions accompany administrative actions or interpretations. In *Train, supra,* the Court deferred to the Administrator's interpretation of the Clean Air Act even though his interpretation had been rejected by every Circuit to consider it, 421 U. S., at 72, and even though the interpretation was expressed and "supported" only by a single sentence in the Federal Register. 36 Fed. Reg. 22398, 22405 (1971). The Court's "own 'analysis of the structure and legislative history,' " *ante,* at 288 n. 5, was limited to answering the question whether the Administrator's construction was "sufficiently reasonable" to be permissible. 421 U. S., at 75. Similarly, in *Norwegian Nitrogen Co.* v. *United States,* 288 U. S. 294, the Court deferred to an administrative *practice* that apparently was formally justified only after the practice was challenged in court. *Id.,* at 311, 314–315.

The Administrator began the process of promulgating this rule within weeks of § 112's enactment, 36 Fed. Reg. 23242 (1971). The wise teaching of Mr. Justice Cardozo, who spoke for the Court in *Norwegian Nitrogen Co.* v. *United States,* 288 U. S. 294, is therefore directly pertinent. He observed that an administrative "practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Id.,* at 315.

The Court holds that these well-established doctrines apply only in "ordinary circumstances." *Ante,* at 288. I do not understand why these rules of construction should be less applicable in the unusual than in the ordinary case. Indeed, it seems to me that the extraordinary importance of regulating a hazardous air pollutant in a way that is both fair and effective provides an additional reason for respecting the Administrator's reliance on well-established doctrine, rather than a reason for reaching out to undermine his authority.[19]

In the Court's view, however, the enactment of amendments to the Clean Air Act in 1977 was an extraordinary circum-

---

[19] There is even more reason than usual to defer to the Administrator in the present case. Here we must decide whether the asbestos-wetting regulation is an emission standard within the meaning of a statute that allows prompt appellate review of such standards in a single court and precludes later challenges. § 307 (b), 42 U. S. C. § 1857h–5 (b) (1970 ed., Supp. V). Congress clearly wanted speedy, uniform, and final review of hazardous emission standards. Because this regulation is an attempt to control hazardous emissions on a nationwide basis, the need for speedy, uniform, and final review is just as great here as in the case of a numerical standard. If the reasons set forth in Part IV of the Court's opinion are sufficient to sustain a collateral attack on this regulation, the preclusion statute has become almost meaningless. Of course, I do not suggest that the Administrator may take advantage of preclusion by simply "deeming" a regulation an emission standard. But when his characterization is challenged, we should try to understand the reason for the characterization before assuming that it was the product of a "Humpty Dumpty" thought process. See *ante,* at 283.

stance that justifies a departure from settled principles. The Court takes the novel position that the Administrator's construction of the 1970 Amendments may be ignored because the legislative history of the 1977 Amendments did not produce an explicit endorsement of his construction. In my judgment this holding places an unwise limit on the deference which should be accorded to administrators' interpretations of the statutes they enforce. It also misreads the history of the 1977 Amendments.

## III

The Court's conclusion ultimately rests on the 1977 Amendments. Even accepting the dubious premise that we can rely on the 95th Congress to tell us what the 93d had in mind, the 1977 Amendments do not support the Court's interpretation of the statute.

The history of the Amendments is instructive. In late 1974, several wrecking companies successfully challenged indictments brought against them in the Northern District of Illinois for violating the wetting requirements.[20] Six weeks after the first court ruling, the Administrator proposed an amendment that would expressly confirm his authority to establish design, equipment, or work-practice standards when numerical emission limitations were not feasible.[21] A major bill to amend the Clean Air Act was proposed in the 94th Congress, but the House and Senate were unable to agree. In 1977, the Senate again proposed a major revision. It included the Administrator's requested authorization. S. Rep.

---

[20] See *United States* v. *National Wrecking Co.*, No. 74 CR 755 (Dec. 20, 1974); *United States* v. *Nardi Wrecking Co.*, No. 74 CR 756 (Jan. 2, 1975); *United States* v. *Harvey Wrecking Co.*, No. 74 CR 758 (Jan. 7, 1975); *United States* v. *Brandenburg Demolition, Inc.*, No. 74 CR 757 (Jan. 31, 1975).

[21] Letter from Environmental Protection Agency Administrator to Senate Public Works Committee Chairman supporting proposed amendments to the Clean Air Act (Feb. 3, 1975), excerpted in Brief for United States, App. C.

No. 95–127, p. 163. The Senate Report does not indicate whether the Senators considered the Illinois decisions correct or incorrect. *Id.*, at 44. However, as introduced in the Senate, the bill clearly provided that a design, equipment, or operational standard was a species of "hazardous emission standard." [22]

When the bill emerged from conference, it no longer expressly stated that a work-practice rule was an emission standard. This change therefore lends support to the Court's view. But it is most unlikely that the Conference Committee intended to express indirect disapproval of the Administrator's reading of the 1970 Amendments. The Conference Report explained that the change in language was merely intended to "clarify" an aspect of the Senate version which was unrelated to the question whether a work-practice rule is, or had been a species of emission standard.[23]

---

[22] The bill provided, in relevant part:

"(e) For purposes of this section the Administrator may promulgate a hazardous emission standard in terms of a design, equipment, or operational standard if he determines that such standard is necessary to control emissions of a hazardous pollutant or pollutants because, in the judgment of the Administrator, they cannot or should not be emitted through a conveyance designed and constructed to emit or capture such pollutants." S. Rep. No. 95–127, p. 163 (1977).

[23] The Conference Report characterized the original Senate version as follows:

"Amends section 112 of existing law to specify design, equipment, or operational standards for the control of a source of hazardous emissions, where an emission limitation is not possible or feasible to measure hazardous emissions or to capture them through appropriate devices for control." H. R. Conf. Rep. No. 95–564, p. 131 (1977).

It described the conference substitute in these terms:

"The House concurs in the Senate provision with an amendment to clarify that the Administrator may specify a hazardous design standard if the emission of hazardous pollutants through a conveyance designed to emit or capture such pollutants would be inconsistent with any Federal, State or local law and minor clarifying modifications in the language." *Id.*, at 131–132.

There is only one relevant lesson that may be learned from this history: As soon as someone challenged the Administrator's power to promulgate work-practice rules of this sort, Congress made it unambiguously clear that the Administrator had that power. As the Court notes, Congress preferred numerical standards; it accepted work-practice rules only as a last resort. But the same may be said of the Administrator, who instituted a wetting requirement only after becoming convinced that no other standard was practicable.

It is true, as the Court says, that the Senate Report "refrained from endorsing the Administrator's view that the regulation had previously been authorized as an emission standard under § 112 (c)." *Ante,* at 289. It is equally true that the Senate Report refrained from criticizing the Administrator's view. In short, what Congress *said* in 1977 sheds no light on its understanding of the original meaning of the 1970 Amendments. But what Congress *did* when it expressly authorized work-practice rules persuasively indicates that, if Congress in 1970 had focused on the latent ambiguity in the term "emission standard," it would have expressly granted the authority that the Administrator regarded as implicit in the statute as written.[24]

---

[24] This conclusion is buttressed by the recent amendment to the judicial review provision of the Clean Air Act. *Ante,* at 286 n. 4. At oral argument in the present case, Members of this Court pointed out that § 307 (b) applied by its terms only to "emission standards" and suggested that the words "emission standard" should be given a narrow reading. See, *e. g.,* Tr. of Oral Arg. 20. That was on October 11. On November 1, a technical-amendments bill was introduced in both Houses to clarify "ambiguous language" and "technical problems" in the Clean Air Act. See 123 Cong. Rec. S18372 (Nov. 1, 1977) (statement of Sen. Muskie); see also *id.,* at H11953 (reading of H. Res. 885). The bill, which passed both Houses and was signed into law on November 16, treated the Court's present reading of "emission standard" as a simple error. To prevent future misreadings of the provision, Congress amended it to apply to "any emission standard *or requirement*" under § 112. See § 307 (b) (1), 42 U. S. C. § 7607 (b) (1) (1976 ed., Supp. I), as amended and recodified

## IV

A reading of the entire statute, as amended in 1977, confirms my opinion that the asbestos regulation is, and since its promulgation has been, an emission standard. If this is not true, as the Court holds today, it is unenforceable, and will continue to be unenforceable even if promulgated anew pursuant to the authority expressly set forth in the 1977 Amendments.

The Clean Air Act treats the Administrator's power to promulgate emission standards separately from his power to enforce them. While it is § 112 (b) that gives the Administrator authority to promulgate an "emission standard," it is § 112 (c) that prohibits the violation of an "emission standard." Presumably the Court's holding that a work-practice rule is not an "emission standard" applies to both of these sections. Under that holding a work-practice rule may neither be enforced nor promulgated as an emission standard. This holding will not affect the Administrator's power to promulgate work-practice rules, because the 1977 Amendments explicitly recognize that power. But Congress has not amended § 112 (c), which continues to permit enforcement only of "emission standards." Accordingly, the Court's holding today has effectively made the asbestos regulation, and any other work-practice rule as well, unenforceable.

Ironically, therefore, the 1977 Amendments, which were intended to lift the cloud over the Administrator's authority, have actually made his exercise of that authority ineffectual. This is the kind of consequence a court risks when it substitutes its reading of a complex statute for that of the Administrator charged with the responsibility of enforcing it. More-

by the Safe Drinking Water Amendments of 1977, § 14 (a) (79), 91 Stat. 1399 (emphasis added). The presence of a similar ambiguity in the enforcement provision was not pointed out at oral argument, and it was not corrected. This history indicates that Congress is patiently correcting judicial errors in construing "emission standard" narrowly.

over, it is a consequence which would be entirely avoided by recognizing that the Administrator acted well within his statutory authority when he promulgated the asbestos regulation as an "emission standard" for hazardous air pollutants.

I would affirm the judgment of the Court of Appeals for the Sixth Circuit.