**PPG INDUSTRIES, INC., Petitioner,**

v.

**Adlene HARRISON, Regional Administrator and Anne M. Gorsuch, Administrator of Environmental Protection Agency, Respondents.**

No. 77–2989.

United States Court of Appeals, Fifth Circuit.*

Nov. 5, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Oliver P. Stockwell, Lake Charles, La., George P. Cheney, Jr., Pittsburgh, Pa., Charles F. Lettow, Washington, D. C., for petitioner.

J. Berry St. John, Jr., John M. Wilson, New Orleans, La., Clyde R. Hampton, Denver, Colo., Douglas D. Ehrlich, Houston, Tex., for intervenor.

Bethami Auerbach, E. P. A., James W. Moorman, Asst. Atty. Gen., Angus Macbeth, Chief, Pollution Control Section, Nancy Marvel, Earl Salo, Atty., E. P. A., Washington, D. C., for respondents.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before RONEY, TJOFLAT and HILL, Circuit Judges.

RONEY, Circuit Judge:

In this case PPG Industries, Inc. [PPG] appeals an action of the Administrator of

the Environmental Protection Agency [EPA] subjecting the "waste heat" boilers of its recently constructed power plant to new source performance standards for fossil fuel-fired steam generating units. 40 C.F.R. §§ 60.40–.46 (1977). Holding these performance standards were improperly applied to PPG's waste heat boilers, which are fueled only partially by fossil fuels, we set aside the EPA action. Because of this disposition of the case, we do not address other contentions offered by PPG in opposition to the action taken by EPA.

## I. *The Statutory and Regulatory Framework*

Before setting out the particular facts of this case, it may be helpful to describe the general statutory and regulatory scheme involved.

In passing the Clean Air Act Amendments of 1970, Congress for the first time established a comprehensive federal-state scheme for the control and abatement of air pollution. 42 U.S.C. § 1857 (1970). The Clean Air Act was again substantially amended in 1977, and the final amended version is codified at 42 U.S.C.A. §§ 7401–7642.[1]

The 1970 Amendments required the EPA Administrator to set national ambient air quality standards for "criteria" pollutants.[2] Each state, in turn, was required to adopt and submit for EPA approval a plan providing for "implementation, maintenance, and enforcement" of the national standard within the given state. 42 U.S.C.A. § 7410.

While emissions from both existing and new sources of pollution are regulated under the various state implementation plans, Congress, "concerned that new plants—new sources of pollution—would have to be con-

trolled to the greatest degree practicable if the national goal of a cleaner environment was to be achieved," *Essex Chemical Corp. v. Ruckelshaus,* 486 F.2d 427, 434 n.14 (D.C. Cir.1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), determined that all new sources should be subject to an additional layer of federal control. It therefore enacted section 111, which required the establishment of "standards of performance" for all new sources. 42 U.S.C. § 1857c–6 (1970), *as amended,* 42 U.S.C.A. § 7411. "New source" is defined in the Act as "any stationary source, the construction or modification of which is commenced after the publication of regulations . . . prescribing a standard of performance under this section which will be applicable to such source." 42 U.S.C.A. § 7411(a)(2).

Under section 111(b), the EPA Administrator was directed to publish a list of those categories of stationary sources determined to contribute significantly to air pollution which causes or contributes to endangerment of public health or welfare. 42 U.S.C.A. § 7411(b)(1)(A). Standards of performance for these sources were then to be promulgated, after an opportunity for public comment.

In accordance with this directive, the Administrator published in March 1971 an initial list of five stationary source categories. Among the listed sources were fossil fuel-fired steam generators. Later that year, regulations establishing new source performance standards were proposed and promulgated for each source. Regulations of general applicability are grouped in Subpart A, 40 C.F.R. §§ 60.1–.15 (1977), while the regulations implementing the new

---

1. The history and structure of the 1970 Amendments are discussed in *Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 63 · 67, 95 S.Ct. 1470, 1474–76, 43 L.Ed.2d 731 (1975).

2. 42 U.S.C. §§ 1857c–3, 1857c–4 (1970), *as amended,* 42 U.S.C.A. §§ 7408, 7409.

 National ambient air quality standards are of two types. "Primary" standards are those which, in the Administrator's judgment, are "requisite to protect the public health."

"Secondary" standards are "requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of [a criteria] air pollutant in the ambient air." 42 U.S.C.A. § 7409(b)(1) and (2).

Standards have been set for six "criteria" pollutants: sulfur dioxide, particulate matter, carbon monoxide, photochemical oxidants, hydrocarbons, and nitrogen dioxide. 40 C.F.R. §§ 50.4–.11 (1977).

source performance standards for fossil fuel-fired steam generators are located in Subpart D, 40 C.F.R. §§ 60.40–.46 (1977). The standards of performance are written as emission limitations (in pounds per million British thermal units heat input or grams per million calories) which may not be exceeded. *See* 40 C.F.R. §§ 60.42–.45 (1977).

Under the regulations, each fossil fuel-fired steam generating unit having a heat input of at least 250 million British thermal units per hour must meet new source performance standards for particulate matter, sulfur dioxide, and nitrogen oxides. *Id.* at §§ 60.42–.44. In order to measure compliance, section 60.45 provides that the source owner or operator must install and maintain continuous monitoring systems for measuring emissions of these pollutants.

## II. *PPG's Lake Charles Facility*

Petitioner PPG owns and operates a chemical manufacturing plant located at Lake Charles, Louisiana, which requires large amounts of steam and electricity for its operations. To meet its energy requirements, PPG constructed a power plant designed to take advantage of new fuel-efficient "cogeneration" technology. The power plant is comprised of two parallel units. In each unit, a gas turbine burns fossil fuel to produce electricity. "Waste heat" gases thrown off by the turbine's exhaust, which would otherwise be discharged into the atmosphere, are funnelled as a heat source into a "waste heat" boiler. The total heat input of that boiler comes from a combination of waste heat and fossil fuel combustion. The waste heat contributes nearly 40% (approximately 371 million British thermal units per hour) of the total heat input to the boiler. A portion of the waste heat aids in the combustion of fossil fuel, either fuel oil or natural gas, which provides the other 60% of the heat input (approximately 598 million British thermal units) to the boiler. The highly pressurized steam thereby created in the boiler is used to turn a "backpressure" turbo-generator. This produces electricity which is then channelled back into PPG's main plant for use in the manufacturing process.

PPG's system is technically called a "supplementary-fired, combined-cycle cogeneration" system. The use of supplemental fossil fuel to heat the boiler distinguishes it from a standard combined-cycle cogeneration system, in which the boiler is heated solely by waste heat gases produced by the turbine. In such a standard system, the boiler produces only medium pressure steam which may nevertheless be useful in the manufacturing process. The addition of supplemental fossil fuel in PPG's cogeneration system, however, makes it more efficient by enabling the boiler to make high pressure steam that can be used to produce electricity.

The air pollutants from PPG's power plant are similar to those of any other boiler fired by fossil fuel. The pollutant of principal concern is sulfur dioxide, which is formed during combustion of sulfur-bearing fuels in the presence of oxygen. The higher the sulfur content of the fuel, the greater the amount of sulfur dioxide emitted upon combustion. Virtually all of the sulfur dioxide emissions from the power plant are directly attributable to the burning of fuel oil in the waste heat boiler and virtually none to the gas turbine exhausts. These emissions are, of course, considerably less than if the boiler were totally fired by fossil fuel. They may be reduced through the use of either flue gas desulfurization equipment ("scrubbers") or fuel with a low sulfur content.

In addition to sulfur dioxide emissions, PPG's power plant emits particulate matter and nitrogen oxides. These pollutants, however, are not of great concern in this case, because nitrogen oxides are controlled primarily through boiler design, and combustion of fuel oil does not produce significant particulate emissions.

## III. *Agency and Court Proceedings*

As a result of correspondence in 1975 and 1976 with PPG and its fuel supplier, intervenor Continental Oil Company, the EPA learned of the construction of PPG's new power plant. Upon EPA's inquiry, PPG provided detailed information on the design

and construction of the power plant, along with information regarding other power generating facilities at the Lake Charles works.

In April 1977, after further correspondence among the parties, PPG filed a formal request under 40 C.F.R. § 60.5 (1977)[3] for an EPA determination that (1) the standards of performance do not apply to boilers which, like those at PPG's Lake Charles works, derive a substantial amount of heat from turbine exhaust gases (waste heat) and (2) the construction of PPG's new power plant was commenced prior to August 17, 1971, the date of publication of proposed standards of performance for fossil fuel-fired steam generators. PPG also asked EPA for a clarifying determination as to the application of the Subpart D standards of performance to waste heat boilers if EPA ultimately determined that the standards governed the operation of PPG's boilers.

In response to these three requests, the Regional Administrator of EPA's Region VI determined that PPG's waste heat boilers were subject to the new source standards of performance for fossil fuel-fired steam generators even though they burned a combination of fossil fuel and waste heat. EPA also rejected PPG's argument that construction of the waste heat boilers should be considered to have commenced before August 17, 1971, on the ground that the waste heat boilers were not ordered or constructed until after this date.

In response to PPG's request for a determination clarifying application of the performance standards to the waste heat boilers' output, EPA ruled that compliance with the standards would be based only on the amount of heat and combustion effluents produced by the fossil fuel burned in the waste heat boilers. The turbine generators, having been ordered prior to Au-

gust 17, 1971, were not subject to the new source standards of performance. The effluents from the turbines' waste heat gasses as well as the portion of the heat input derived from this source would therefore be excluded in determining whether the steam generator plant complied with the standards.

The Director of the Division of Stationary Source Enforcement of EPA ultimately upheld these determinations and further ruled that since PPG had chosen low sulfur fuel rather than scrubbers as the method for meeting the performance standards, it would be required to burn such fuel at all times subsequent to the performance tests run on the boilers. He also determined that PPG was not required to install equipment for the continuous monitoring of sulfur dioxide and nitrogen oxide emissions as mandated by the performance standards, but that it must install and operate continuous opacity monitors in the stacks of the waste heat boilers and might also be required to monitor and report on the sulfur content of the fossil fuel burned in the boilers.

Thereupon PPG, uncertain of jurisdiction, filed a petition for review of the EPA determinations both in this Court and in the district court. In an earlier opinion, we dismissed the petition for lack of jurisdiction based on the view that direct review rested in the district court. *PPG Industries, Inc. v. Harrison*, 587 F.2d 237 (5th Cir. 1979). The Supreme Court, holding the petition was properly filed in the Court of Appeals, reversed and remanded the case for further proceedings. 446 U.S. 578, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980). Accordingly, we now address the petition on its merits, after briefly setting forth the applicable standard of review.

## IV. *Standard of Review*

The standard of review for the agency action in this case is provided by section

---

**3.** 40 C.F.R. § 60.5 (1977) provides in pertinent part as follows:

(a) When requested to do so by an owner or operator, the Administrator will make a determination of whether action taken or intended to be taken by such owner or operator constitutes construction (including recon-

struction) or modification or the commencement thereof within the meaning of this part.

(b) The Administrator will respond to any request for a determination under paragraph (a) of this section within 30 days of receipt of such request.

307(d)(9) of the Clean Air Act, 42 U.S.C.A. § 7607(d)(9). The Court must determine whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at § 7607(d)(9)(A). Scrutiny under this standard involves the following:

> To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). *See also Refrigerated Transport Co. v. ICC,* 616 F.2d 748, 751 (5th Cir. 1980); *Texas v. EPA,* 499 F.2d 289, 296 (5th Cir. 1974), *cert. denied,* 427 U.S. 905, 96 S.Ct. 3191, 49 L.Ed.2d 1199 (1976). We must therefore assure ourselves that the agency "demonstrably has given reasoned consideration to the issues, and has reached a result which rationally flows from its conclusions." *Sierra Club v. EPA,* 540 F.2d 1114, 1124 (D.C. Cir. 1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977) (*quoting National Association of Food Chains, Inc. v. ICC,* 535 F.2d 1308, 1315 (D.C. Cir. 1976)).

■ Moreover, a reviewing court must determine whether the action was within the agency's statutory authority. 42 U.S. C.A. § 7607(d)(9)(C). *See also Asarco, Inc. v. EPA,* 616 F.2d 1153, 1158 (9th Cir. 1980); *Texas v. EPA, supra,* 499 F.2d at 296. This requires a careful examination of the words of the statute, the legislative history, and the reasons advanced by the agency to justify its interpretation in order to determine whether that interpretation is "sufficiently reasonable ... [to be] accepted by the reviewing courts." *Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1480, 43 L.Ed.2d 731 (1975); *ASARCO, Inc. v. EPA,* 578 F.2d 319, 325–26 (D.C. Cir. 1978).

■ When as here the agency's construction of its own administrative regulations is in issue, the Court must further determine whether the agency's reading of the regulations is reasonable and consistent over time. The agency's interpretation is of controlling weight "unless it is plainly erroneous or inconsistent with the regulation." *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965) (*quoting Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

Guided by these principles, we review the EPA's application of new source performance standards for fossil fuel-fired steam generators to PPG's waste heat boilers.

## V. Application of EPA Regulations to Waste Heat Boilers

■ A threshold definitional issue must first be considered. The EPA regulations define a "fossil fuel-fired steam generating unit" as "a furnace or boiler used in the process of burning fossil fuel for the purpose of producing steam by heat transfer." 40 C.F.R. § 60.41(a). PPG contends this definition includes only boilers operating entirely on fossil fuel, and does not include PPG's waste heat boilers which use a combination of fossil fuel and waste heat gases.

Neither the language of the definition nor the intent of the steam generating unit regulations supports such a narrow reading. The literal language of the definition includes waste heat boilers, because they are "used in the process of burning fossil fuel," in this case fuel oil or natural gas, for the purpose of producing steam. The fact the boilers use waste heat gases as an additional source of heat makes no difference. The intent of the EPA was to control potentially harmful pollutants produced by the burning of fossil fuels in steam generating units. *See* EPA, *Background Information for Proposed New-Source Performance Standards* 3–17 (1971). It is undisputed that such pollutants are produced by the fossil fuel used in PPG's waste heat boilers.

While the waste heat boilers fall within the definitional requirement of the steam

generating unit regulations, it remains to be determined whether they were properly subjected to that part of the regulations, as written, setting forth *performance standards* for particular pollutants. The performance standard regulation for sulfur dioxide, which is the pollutant of chief concern in this case, provides the following:

(a) On and after the date on which the performance test required to be conducted . . . is completed, no owner or operator subject to the provisions of this subpart shall cause to be discharged into the atmosphere from any affected facility any gases which contain sulfur dioxide in excess of:

(1) 340 nanograms per joule heat input (0.80 lb per million Btu) derived from liquid fossil fuel or liquid fossil fuel and wood residue.

(2) 520 nanograms per joule heat input (1.2 lb per million Btu) derived from solid fossil fuel or solid fossil fuel and wood residue.

(b) When different fossil fuels are burned simultaneously in any combination, the applicable standard (in ng/J) shall be determined by proration using the following formula:

. . . . .

(c) Compliance shall be based on the total heat input from all fossil fuels burned, including gaseous fuels.

40 C.F.R. § 60.43 (as revised in 1976).

The EPA argues it properly applied this performance standard regulation to PPG's waste heat boilers. It contends that under the express language of the regulation, the performance standard may be applied to that portion of heat input to the boilers "derived" from fossil fuel, with the remaining portion of the heat input derived from waste heat disregarded.

■ A careful analysis of the new source performance standard regulation, however, indicates it was not drawn to apply to boilers burning a combination of fossil fuel and waste heat. By so applying it, the EPA has acted arbitrarily and capriciously, and arguably beyond its statutory authority.

1. *Intent of the Regulation*

Recognizing that companies often find it efficient to use a combination of fossil fuels in boilers, the EPA drafted section 60.43 so that compliance with the performance standard would be based on the total heat input from a fossil fuel mixture. *See* 36 Fed.Reg. 24876 (December 23, 1971); 41 Fed.Reg. 51397 (November 22, 1976). Accordingly, separate standards were established for each type of fossil fuel, since different fossil fuels emit different amounts of sulfur dioxide, depending on their sulfur content. Subsection (a)(1) establishes a standard for the portion of the heat input derived from liquid fossil fuel (fuel oil). Subsection (a)(2) provides the standard for the portion derived from solid fossil fuel (coal). Subsection (b) sets forth a proration formula when fuels are mixed, with the standard being based on the combined heat input from the fuel mixture. No standard was established for gaseous fossil fuel (natural gas) because of its very low sulfur content, although under subsection (c) the heat derived from this fuel is added to the total heat input in determining compliance.

Section 60.43, then, was intended to establish performance standards only in the context of a *mixture of fossil fuels*. The language of the regulation and the EPA materials surrounding its promulgation do not suggest it was ever intended to apply to a *mixture of fossil fuel and waste heat.*

2. *Arbitrary and Capricious Application of Performance Standard*

■ By applying the new source performance standard to PPG's waste heat boilers, the EPA has acted inconsistently with its previous positions on the use of high sulfur fuel in combination with other heat sources. Such inconsistency must be viewed as arbitrary and capricious.

In recognition of the cost savings and efficiency that may be achieved through the use of mixtures of fossil fuels, the EPA drafted section 60.43 so that the sulfur dioxide performance standard is based on the *total* heat input from the fuel mixture.

The section thus permits a boiler operator to burn a relatively high sulfur fossil fuel in combination with a very low sulfur fuel (such as natural gas) to obtain a fuel mixture which would meet the standard. *See* 36 Fed.Reg. 24876 (December 23, 1971).

In a 1976 revision of its steam generating unit regulations, the EPA extended this treatment of fossil fuel mixtures to mixtures of wood residue and high sulfur fuel. For such mixtures, the regulations now base compliance with new performance standards on the total heat input from both sources, rather than, as here, solely on the heat input from the fossil fuel. The EPA stated as the basis for its revision:

> Since Subpart D allows the blending of high and low sulfur fossil fuels, EPA has concluded that it is reasonable to extend application of this principle to wood residue which, although not a fossil fuel, does have low sulfur content. . . . New facilities will comply with the standards for less cost than at present because they will be able to use wood residue, a valuable source of energy, as an alternative to expensive low sulfur fossil fuels. Also, using wood residue as a fuel supplement instead of low sulfur fossil fuels will result in substantial savings in the consumption of scarce natural gas and oil resources, and will relieve what would otherwise be a substantial solid waste disposal problem.

41 Fed.Reg. 51397–98 (November 22, 1976).

If in the present case the EPA had acted consistently with its prior treatment of boilers using fuel mixtures, it would have applied the performance standard to mixtures of fossil fuel and waste heat on the basis of *total* heat input, rather than on the heat input derived from the fossil fuel alone. The EPA has offered no rational explanation for its refusal to extend this treatment to fossil fuel-waste heat mixtures.

The arbitrariness of the EPA action is also reflected by the resulting inconsistent treatment given to two companies whose boilers emit the same quantity of pollutants per unit of heat input. This may best be illustrated by example. Company A maintains a conventional boiler which runs entirely on a combination of fossil fuels and has a total heat input of X British thermal units (Btu). The boiler emits Y amount of sulfur dioxide per Btu of heat input. Assume that in order to meet the EPA's new source performance standard for sulfur dioxide, the company must burn low sulfur fuel in its boiler, which is more expensive than high sulfur fuel, or some other method of pollutant control.

Company B—PPG—maintains a waste heat boiler which burns a combination of fossil fuel and waste heat gases. Even with the same heat input as Company A's conventional boiler because of its efficient use of waste heat, it has *less* sulfur dioxide emission than the conventional boiler. In order to meet a performance standard based on equal heat input, the boiler could use high sulfur fuel along with the waste heat, and thereby achieve a savings over the conventional boiler in cost and energy efficiency.

EPA's action, however, prevents this. By applying the sulfur dioxide performance standard only to the portion of the heat input derived from the fossil fuel rather than to the total heat input, the EPA in effect requires PPG to use low sulfur fuel like the conventional boiler instead of the higher sulfur fuel. The result is that PPG is forced to maintain a *higher* performance standard than Company A, because the waste heat boiler's use of waste heat and low sulfur fuel produces less sulfur dioxide per Btu of total heat input than the conventional boiler's use of all low sulfur fuel. PPG, then, is subject to stricter performance standards than companies that use conventional boilers. We therefore hold the manner in which the EPA applied the sulfur dioxide performance standard to PPG's waste heat boilers was arbitrary.

3. *Application of Performance Standard in Excess of Statutory Authority*

Section 111 of the Clean Air Act, as originally enacted, authorized the EPA to establish "standards of performance" for new sources. 42 U.S.C. § 1857c–6 (1970). A

"standard of performance" is defined in the Act as

> a *standard for emissions of air pollutants which reflects the degree of emission limitation* achievable through the application of the best system of emission reduction which . . . the Administrator determines has been adequately demonstrated.

42 U.S.C. § 1857c–6(a)(1) (emphasis supplied). Thus, standards of performance could be established only in the form of *emissions limitations*, based on output, and not in the form of work practice or operation requirements. *Cf. Adamo Wrecking Co. v. United States*, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978) (under section 112 of the Clean Air Act, whose provisions are analogous to section 111, the EPA had no authority to establish procedures for building demolitions for purpose of controlling asbestos emissions; EPA could only establish emissions limitation).

 Setting standards which in effect require a use of a certain type of fuel, without regard to other types of emission control, appears to be a work practice or operation standard beyond the statutory authority of the EPA. While Congress subsequently amended section 111 to permit the EPA to establish "design, equipment, work practice, or operational standards," *see* 42 U.S.C.A. § 7411(h)(1),[4] the EPA concedes this amendment was not in effect at the time it issued the determination letters in this case. EPA in effect concedes it could not simply require the burning of low sulfur fuel.

The EPA argues it did not require PPG to use low sulfur fuel in its waste heat boilers, but only enforced a performance standard based on an emissions limitation. Even though the EPA did not expressly require the use of low sulfur fuel, however, the manner in which it has applied the emissions limitations achieves the same result. If the EPA had applied an emissions limitation based on the *total* heat input to the boilers, as it has done with respect to boilers burning fossil fuel mixtures or mixtures of wood residue and fossil fuel, PPG would have had the opportunity to determine whether to comply by using a combination of high sulfur fuel and waste heat, or some other fuel mixtures, or using some other method of emission control. Because the EPA based the emission limitation solely on the portion of the heat input derived from fossil fuel, however, it in effect ruled out any way to achieve the standard in PPG's cogeneration boiler except by the use of low sulfur fuel in order to comply. EPA concedes the use of "scrubbers," the only other possible method to meet the emissions limitation, is prohibitively expensive for this cogeneration unit. Thus, the EPA attempts to achieve indirectly in this case what it could not do directly under the Clean Air Act: require the use of a certain type of fuel in order to comply with a performance standard.

We hold the EPA erred in applying the new source performance standards to PPG's waste heat boilers. Under the law as it existed at the time of this action, the agency could not, consistent with its regulations, past practices and statutory authority, base compliance with emissions limitations solely on that portion of the heat input derived from fossil fuel. The EPA may revise its regulations so that compliance is based on the *total* heat input to the waste heat boilers according to a prorated formula, as it has done with respect to both fossil fuel mixtures and mixtures of wood residue and fossil fuel.

In the disposition of this case, we assume without deciding that "construction commenced" prior to the effective date of the

---

4. Section 111(h)(1) of the Clean Air Act, added in 1977, provides in pertinent part:

> (h)(1) For purposes of this section, if in the judgment of the Administrator, it is not feasible to prescribe or enforce a standard of performance, he may instead promulgate a design, equipment, work practice, or operational standard, or combination thereof,

which reflects the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated. 42 U.S.C.A. § 7411(h)(1).

EPA regulations, for the purpose of determining the applicability of the new source performance standards. We need not decide whether PPG's new evidence which shows highly favorable emission results in the operation of the plant affects the validity of the EPA's determinations, or whether such evidence was properly presented to this Court without prior submission to the agency.

The petition to set aside the EPA determinations is granted.

PETITION TO SET ASIDE GRANTED.