**UNITED STATES of America**

v.

**ETHYL CORPORATION.**

**Civ. A. No. 83–0120–A.**

United States District Court, M.D. Louisiana.

July 1, 1983.

Ian Hipwell, Asst. U.S. Atty., Baton Rouge, La., for plaintiff.

Ronald A. Seale, Seale, Smith & Phelps, Baton Rouge, La., for defendant.

JOHN V. PARKER, Chief Judge.

This matter is presently before the court on defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Each side has urged its position in oral argument and has submitted additional briefs on issues raised in argument. After carefully considering all the arguments and conducting its own research, the court concludes that it has no choice but to grant the motion.

The complaint alleges that Ethyl Corporation discharged vinyl chloride on at least 98 separate occasions over a six year period from 1977 to 1982 from its Baton Rouge, Louisiana, plant, all in violation of the Clean Air Act, 42 U.S.C. § 7401, *et seq.* Specifically, the complaint alleges that Ethyl discharged at least 168,622.7 pounds of vinyl chloride to the atmosphere from relief valves on equipment in vinyl chloride service on at least 81 separate occasions—all in violation of 40 C.F.R. § 61.65(a). That regulation provides that

Except for an emergency relief discharge, there is to be no discharge to the atmosphere from any relief valve on any equipment in vinyl chloride service. An emergency relief discharge means a discharge which could not have been avoided by taking measures to prevent the discharge.

In addition, Ethyl additionally manually vented gas containing at least 14,596 pounds of vinyl chloride from valves on polyvinyl chloride reactors on 17 separate occasions, thereby violating 40 C.F.R. § 61.64(a)(3)—which again prohibits discharges which could "have been avoided by taking measures to prevent" them. The complaint seeks to enjoin Ethyl from future violations of the vinyl chloride regulations and to require that Ethyl develop and implement a plan to prevent future discharges of vinyl chloride. The government also seeks a civil penalty of $25,000 for each day that Ethyl violated the regulations at issue.

The enforceability of these regulations depends upon their characterization as "emission standards" or "work practice" standards. Making that deceptively simple characterization first requires a journey through the labyrinths of the Clean Air Act.

Under Section 112 of the Clean Air Act the Administrator of the Environmental Protection Agency (EPA) is authorized to promulgate regulations setting emission standards for hazardous air pollutants. 42 U.S.C. § 7412. A "hazardous air pollutant" presently is defined as one "to which no ambient air quality standard is applicable and which in the judgment of the Administrator causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." 42 U.S.C. § 7412(a)(1).

The Administrator designated vinyl chloride[1] a hazardous air pollutant in Decem-

---

1. For a discussion of vinyl chloride, its uses in industry and its effects upon those who are

exposed to it, *see, e.g., Society of the Plastics Industry, Inc. v. Occupational Safety & Health*

ber, 1975. 40 Fed.Reg. 59477. In October, 1976, he promulgated the emissions standards for vinyl chloride. 41 Fed.Reg. 46560, now codified at 40 C.F.R. § 61.60 *et seq.*

Discharging an air pollutant in violation of the applicable emission standard is prohibited under Section 112(c)(1)(B) of the Clean Air Act. 42 U.S.C. § 7412(c)(1)(B). That violation subjects the violator to civil penalties and an injunction under 42 U.S.C. § 7413(b)(3). And the last passageway in this matrix leads to the controversial jurisdictional bar. Under Section 307(b) of the Act:

> (b)(1) A petition for review of action of the Administrator in promulgating any ... emission standard or requirement under Section 7412 ... may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section ... 7412(c) ... which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit.

> . . . . .

> (2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. 42 U.S.C. § 7607.

The reference to "requirement" in 42 U.S.C. § 7607(b)(1) was added in the 1977 technical amendments. Pub.L. No. 95–190, 91 Stat. 1399. Prior to that time, the Administrator's authority, the enforcement provisions, and the jurisdictional limits all were couched in terms of "emissions standards." (*See e.g.,* § 112(b)(1)(B), as exacted in 1970, Pub.L. No. 91–604, 84 Stat. 1676, § 112(b)(1)(B) (1970) which authorized the setting of "emission standards.") That language caused a split in lower court decisions on whether work practice requirements were permitted under the Act. Con-

gress soon thereafter added Section 112(e) which authorized work practice standards where "it is not feasible to prescribe or enforce an emission standard." 42 U.S.C. § 7412(e)(1) (West Supp.1978). This standard is set out in terms of "a design, equipment, work practice, or operational standard, or combination thereof" rather than in terms of limiting emissions. 42 U.S.C. § 1712(e)(1) (West Supp.1978). The Supreme Court, in *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978) interpreted this sequence of events as an indication that authority to issue requirements—or work practice standards—did not exist prior to the 1977 amendments. 434 U.S. at 283–84, 98 S.Ct. at 572.

Curiously, however, while the 1977 amendments gave the Administrator the authority to promulgate work practice regulations, he seemingly had no authority to enforce them—the enforcement provision referred only to violations of "emission standards." 42 U.S.C. § 7413(b); 434 U.S. at 306, 98 S.Ct. at 583. Congress again reacted and added 42 U.S.C. § 7412(e)(5) in 1978 which provides that "[a]ny design, equipment, work practice, or operational standard, or any combination thereof, described in this subsection shall be treated as an emission standard for purposes of the provisions of this chapter"; *i.e.,* a work practice standard equals an emissions standard for purposes of enforcement. Pub.L. No. 95–623.

In *PPG Industries v. Harrison,* 660 F.2d 628, 636 (5th Cir.1981), the court cited *Adamo* and held that the EPA had authority to issue only emission standards before the 1977 amendments. While *PPG* concerned Section 111 of the Act, the issues were analogous to that of the instant case— whether the contested regulation was a work practice standard, and, if so, whether it was enforceable since it was enacted prior to the 1977 amendments. The court determined that the regulation was "a

---

*Administration,* 509 F.2d 1301 (2d Cir.1975); Doniger, *Federal Regulation of Vinyl Chloride: A*

*Short Course in the Law and Policy of Toxic Substances Control,* 7 Ecology L.Q. 497 (1978).

work practice or operation standard beyond the statutory authority of the EPA" and such requirements are enforceable only if promulgated subsequent to the 1977 amendments. *Id.* While the Administrator reminds us that we may not consider the sufficiency of the regulation and argues that it is indeed an emission standard, we note the words of Justice Rehnquist in *Adamo Wrecking,* "Congress ... did not empower the Administrator, after the manner of Humpty Dumpty in Through the Looking-Glass, to make a regulation an emission standard by his mere designation." 434 U.S. at 283, 98 S.Ct. at 572. Section 307 of the Act bars judicial review of the sufficiency or appropriateness of a regulation, but it does not bar the narrow inquiry as to "whether the regulation which the defendant is alleged to have violated is on its face 'an emission standard' within the broad limits of the congressional meaning of that term." 434 U.S. at 287, 98 S.Ct. at 573.

The regulations governing emergency discharges of vinyl chloride were promulgated in October, 1976, prior to the 1977 amendments. 41 Fed.Reg. 46560, now codified at 40 C.F.R. § 6160 *et seq.;* specifically, 40 C.F.R. §§ 61.65(a) and 61.64(a)(3). Thus, those regulations may be enforced by this court only if they are in fact emis-

sion standards and not work practice regulations camouflaged under the rubric of "emission standards."

Apparently, the two regulations covering emergency discharges of vinyl chloride have been used for little but gathering dust since their enactment. Few cases discuss the work practice/emissions limitations dichotomy, and even fewer concern vinyl chloride regulations.[2] The one reported case discovered mentions the regulations at issue here, but that case was dismissed on other grounds. *Hooker Chemical Company v. United States Environmental Protection Agency,* 642 F.2d 48 (3d Cir.1981). Both sides have referred to a case subsequently arising out of that litigation, *United States of America v. Tenneco Chemicals,* No. 80–4141 (D.N.J. July 6, 1981), where the court, in an unpublished opinion, disposed of numerous defenses raised by Tenneco again under the same provision at issue here, but the court did not mention whether the regulation was challenged as being a work practice regulation. Thus the court now finds itself in the uneasy position of plowing not really new ground, but ground that has lain dormant these many years.

The government argues that 40 C.F.R. §§ 61.65(a) and 61.64(a)(3)[3] are emission

---

2. While virtually no jurisprudence exists on this issue, a few commentators have discussed the vinyl chloride regulations. Two commentators writing after the *Adamo* decision characterized the vinyl chloride standards as work practice standards which would have to be repromulgated under the 1977 amendments. Citing § 61.65 specifically, Doniger matter of factly describes it as specifying "the use of certain equipment and operational techniques." Doniger, *supra,* at 566. (See other references to work practice regulations for vinyl chloride at p. 567, n. 360; p. 568, n. 361; and p. 578.) Another commentator wrote that in some situations, a quantitative limit on emissions "is not practical, either because measurement techniques are available, or because emissions come from many small points in a process and are most easily controlled by numerous equipment or work practice measures at those points. The 1973 asbestos standard and the 1976 vinyl chloride standard both included such measures." ENVIRONMENTAL LAW INSTITUTE, *Design, Equipment, Work Practice or Operational Standards:*

*The 1977 Amendments and Adamo Wrecking Co.,* in AIR AND WATER POLLUTION CONTROL LAW: *1980 at 183 (Wetstone, ed. 1980).*

3. 61.65(a) *Relief valve discharge.* Except for an emergency relief discharge, there is to be no discharge to the atmosphere from any relief valve on any equipment in vinyl chloride service. An emergency relief discharge means a discharge *which could not have been avoided by taking measures to prevent the discharge.* Within 10 days of any relief valve discharge, the owner or operator of the source from which the relief valve discharge occurs shall submit to the Administrator a report in writing containing information on the source, nature and cause of the discharge, the date and time of the discharge, the approximate total vinyl chloride loss during the discharge, the method used for determining the vinyl chloride loss, the action that was taken to prevent the discharge, and measures adopted to prevent future discharges.

61.64(a)(3) Manual vent valve discharge: Except for an emergency manual vent valve dis-

standards setting a quantifiable limit of zero emissions but which also allow the violator to assert an affirmative defense of emergency discharge under certain conditions.

Ethyl responds that the regulations, while phrased in terms of no discharge, indirectly require the use of certain work practices. The regulations actually allow non-quantifiable discharges of vinyl chloride, provided certain work practices and operational techniques are observed.

■ An emission standard is to be distinguished from a work practice standard. An emission "standard is a quantitative 'level' to be attained by use of 'techniques,' 'controls,' and 'technology'." *Adamo Wrecking Co. v. United States*, 434 U.S. at 286, 98 S.Ct. at 573. When "it is not feasible to prescribe or enforce an emission standard," the Administrator is now authorized to enact a "design, equipment, work practice, or operational standard." 42 U.S.C. § 7412(e)(1). The regulation at issue in *Adamo* had been proposed originally as a limit on emissions of zero.[4]

The Administrator concluded, however, after examining the situation, that it would often be impossible to preclude all visible emissions of asbestos during the course of demolition. He chose instead to regulate work practices during demolitions. *Adamo Wrecking Co. v. United States, supra,* 434 U.S. at 287, 98 S.Ct. at 574. Ethyl argues that the defendant in *Adamo* had two choices: He could have zero emissions or he could comply with the work practices required by the regulations. Ethyl contends it has the same two choices: It may have zero emissions or it may comply with

the instructions set out by EPA in the preamble to the regulations, which describe the "measures" required by EPA to prevent "avoidable" discharges:

A zero emission limit is being proposed for relief discharges which can be prevented. In most cases, such discharges from reactors can be prevented by measures including, but not limited to, properly instrumenting the reactors to detect upset conditions, injecting chemicals to stop the polymerization reaction during upset conditions, venting the reactor contents to a gasholder during upset conditions and ultimately to a recovery system, providing employees with improved training on preventing and handling upset conditions, and utilizing a stand-by source of power. For other pieces of equipment, increasing pressure due to inert gases in the system can be relieved by manual venting to a gasholder or recovery system. The conditions which lead to discharges can also be prevented in most cases by proper handling and transfer of vinyl chloride or materials containing vinyl chloride. Discharges which cannot be avoided by taking such preventive measures, such as those caused by natural disaster, will not be in violation of the proposed standard if the owner or operator notifies EPA within 10 days concerning the nature and cause of the discharge. This notification provision is necessary to permit EPA to investigate the surrounding conditions and determine whether the discharge could have been prevented. 40 Fed.Reg. 59539.

---

charge, there is to be no discharge to the atmosphere from any manual vent valve on a polyvinyl chloride reactor in vinyl chloride service. *An emergency manual vent valve discharge means a discharge to the atmosphere which could not have been avoided by taking measures to prevent the discharge.* Within 10 days of any discharge to the atmosphere from any manual vent valve, the owner or operator of the source from which the discharge occurs shall submit to the Administrator a report in writing containing the information on the source, nature and cause of the discharge, the date and time of the discharge, the approximate total vinyl chloride loss

during the discharge, the method used for determining the vinyl chloride loss, the action that was taken to prevent the discharge, and measures adopted to prevent future discharges. (Emphasis added)

4. "Zero" emissions are possible under the Act. See S.Rep. No. 1196, 91st Cong., 2d Sess. at 20 (1970) and Senate Comm. on Public works, "Summary of the Provisions of Conference Agreement on the Clean Air Amendments of 1970," reprinted in A Legislative History of the Clean Air Amendments of 1970, Ser. No. 93–18, 93rd Cong., 2d Sess. at 133 (1974)

Plainly the Administrator does not limit "emergency" to earthquake, tornado, flood or other natural disaster, for the regulations themselves speak in terms of discharges which could not have been avoided by taking "measures." The court can only conclude that the regulations equate "measures" to "work practices" and the Agency's posture in *United States v. Tenneco Chemicals, Inc., supra,* fortifies this conclusion. The court there noted that EPA had instructed Tenneco that only emergency discharges of vinyl chloride that could not have been prevented by taking certain precautions were allowed. A letter from EPA had advised Tenneco that the company must demonstrate that discharges could not have been prevented by implementing any of the following procedures:

(1) employee training programs, including instructions on emergency procedures;

(2) proper inspection and maintenance programs (including replacement of relief valve seals on a sufficiently frequent basis in order to prevent their rupture);

(3) proper design and operation of process and control equipment; and

(4) installation and operation of all control equipment needed to comply with the vinyl chloride standard.

Each of the "measures" to which EPA made reference relates to "design, equipment, work practice, or operational standard, or combination thereof," the definition of work practice. 42 U.S.C. § 7412(c).

Ethyl argues, therefore, that the court's determination of whether a source has violated the emergency discharge regulations will be based not on the quantity of what is emitted but on whether the source has implemented the measures required by the EPA.

Exactly what constitutes an "emergency" or an "avoidable discharge" is unclear. The government argues that that very uncertainty is what renders this regulation an emissions limitation. The government continues that Ethyl is limited to zero emissions by whatever method it chooses; it is allowed, however, to discharge in an emergency—an argument which takes this court in a circle, right back to the definition of "emergency." What the regulation actually says is that unavoidable discharges are those which could not be avoided by the application of work practices.

A commentator discussing the enactment of the Clean Air Act emphasized the need to construe the Act as a whole. The "attainment of ambient air quality," he quoted from Senate Reports, "is possible only through the enforcement of precise and objective emission controls." Jorling, *The Federal Law Pollution Control,* in FEDERAL ENVIRONMENT LAW 1101 (E. Dolgin and T. Guilbert, eds. 1974). An emission standard, according to the Senate Report and the commentator's opinion, had to be one capable of being enforced without "reanalysis of technological or other considerations; ... an objective evidentiary standard would have to be met." *Id.* at 1102. Once standards are set their violation "should be a relatively clear evidentiary matter." *Id.* at 1107.

■ The need for prompt enforcement of regulations which are violated, the court's lack of technological and scientific expertise, the time and study which should preface the promulgation of a regulation—all support the wisdom behind the Congressional intent that emission standards, when finally set, should establish a numerical limit requiring little of the court but its power to enforce compliance after an obvious violation. The 1977 amendment setting out the procedure for promulgating work practice operations likewise has at its base the necessity for clear, objective regulations setting out precise requirements that must be met in certain situations. 42 U.S.C. § 7412(e).

■ These emergency discharge regulations do not meet those goals of clarity and ease of enforcement. The court is aware, of course, that it may not look into the sufficiency of a regulation promulgated by the Administrator. If these regulations are emissions standards, they must be enforced no matter how poorly drafted.

Sections 69.65(a) and 61.64(a)(3), however, require the use of "measures" to avoid emitting vinyl chloride. It is true that these measures are not set out with specificity as is required under the 1977 amendments, but they nevertheless do require compliance with work practices set out, however vaguely, by the EPA. The conclusion is inescapable that these regulations, despite being designated as emission standards by the Administrator, are work practice standards within the meaning of the Act. Compliance with these elusive work practices renders any discharge "unavoidable" and thus non-violative of the regulations. Since they are work practice regulations promulgated prior to the 1977 amendments, they are unenforceable by this court.

Accordingly, defendant's motion to dismiss for failure to state a claim upon which relief can be granted is hereby GRANTED.