712 F.2d 640
 113 L.R.R.M. (BNA) 3679, 229 U.S.App.D.C. 326
 AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCALS 225,
1504, AND 3723, AFL-CIO, Petitioners,
v.
FEDERAL LABOR RELATIONS AUTHORITY.
 No. 82-2182.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 25, 1983.
Decided July 8, 1983.
 
 Mark D. Roth, Washington, D.C., with whom James R. Rosa, Washington, D.C., was on brief, for petitioners.
 William E. Persina, Acting Deputy Sol., Federal Labor Relations Authority, Washington, D.C., with whom Steven H. Svartz, Acting Sol., Federal Labor Relations Authority, Washington, D.C., was on brief, for respondent.
 Before TAMM, GINSBURG and BORK, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 This case concerns the obligation of federal employees' collective bargaining representatives to bargain with federal agencies over the scope of grievance procedures included in a negotiated agreement, and the agencies' corresponding right to bargain to impasse over the scope of those procedures.
 
 
 2
 The American Federation of Government Employees, AFL-CIO, Locals 225, 1504, and 3723 ("AFGE" or "the Union"), contends that under the Federal Service Labor-Management Relations Act, 5 U.S.C. §§ 7101 -35 (Supp. V 1981), the scope of the matters made amenable to negotiated grievance procedures is a "permissive" subject for bargaining, one that the Union may, if it chooses, categorically refuse to address at the bargaining table. The General Counsel to the Federal Labor Relations Authority ("FLRA" or "the Authority") has urged the Authority to rule that grievance procedure scope is a subject parties are obliged to "discuss," but need not bargain, and may not bargain to impasse. The FLRA rejected both of these views: it ruled that "scope" is a "mandatory" subject of bargaining; neither party may refuse to negotiate the matter, but either party may adhere to its position to the point of precipitating a bargaining impasse. The Authority added, however, that if impasse is reached on the scope question, the burden is on the party seeking to narrow scope to show that its position is the more reasonable one.
 
 
 3
 Pursuant to 5 U.S.C. § 7123, the Union seeks our review of three FLRA decisions that turn on this single question of statutory construction. For the reasons set forth below, we affirm the Authority's decisions in the three cases under review.
 
 I. BACKGROUND
 
 4
 A. The Federal Service Labor-Management Relations Act
 
 
 5
 The Federal Service Labor-Management Relations Act ("Act" or "Statute") requires federal agencies and unions representing federal employees to bargain over terms and conditions of employment. The parties are obliged to bargain in good faith;[1] a failure to do so constitutes an "unfair labor practice" which may be the subject of a complaint brought to the FLRA.[2] If negotiations between the parties reach an impasse, either party may refer the dispute to the Federal Service Impasses Panel (the "Panel"). The Panel is authorized to "take whatever action is necessary ... to resolve the impasse." Panel decisions are "binding on [the] parties during the term of the agreement, unless the parties agree otherwise."[3] A party's refusal to acquiesce in a Panel decision is subject to sanction as an unfair labor practice.[4]
 
 
 6
 The Act directs that "any collective bargaining agreement shall provide procedures for the settlement of grievances."[5] Grievance procedures must be fair and simple, expeditious, and designed to safeguard the participation rights of individual employees and the union.[6] Subject to these limitations, the parties may shape the procedures as they choose. Grievances not satisfactorily settled under the negotiated procedures may be submitted to binding arbitration by either party.[7]
 
 
 7
 The Act defines a "grievance" as a complaint by an employee, labor organization, or agency, concerning employment, the interpretation of a collectively bargained agreement, or the application of laws affecting conditions of employment.[8] The legislation's broad, initial requirement that the parties negotiate procedures for settling grievances, 5 U.S.C. § 7121(a)(1), is qualified by the specification that a collective bargaining agreement "may exclude any matter from the application of the grievance procedures." 5 U.S.C. § 7121(a)(2). Five subjects itemized in section 7121(c) of the Act must be excluded from the scope of the grievance procedure.[9]
 
 
 8
 A collectively bargained agreement that excludes from the grievance procedure only the five subjects specified in section 7121(c) is termed a "broad scope" agreement; one that excludes other subjects as well is called a "limited scope" agreement. In the negotiations in question here the agencies sought, and the Union opposed, limited scope agreements, agreements that would have excluded from the grievance procedure such matters as reductions in force, uncoerced resignations, position classifications, and interpretations of agency regulations. Joint Appendix (J.A.) 38.
 
 B. Vermont Guard
 
 9
 The FLRA's pathmarking decision holding grievance procedure scope a mandatory subject of bargaining is Vermont Air National Guard, Burlington, Vermont and Association of Civilian Technicians, Inc., 9 FLRA 737 (1982) ("Vermont Guard "). In Vermont Guard, a union charged an agency with an unfair labor practice for "insisting to impasse on the exclusion [of certain adverse actions] from the scope of [the negotiated grievance] procedure." Id. at 738. The FLRA's General Counsel[10] argued to the Authority that a party seeking a full scope grievance procedure must consider the other party's proposal for a limited one; however, he continued, the proponent of a limited scope procedure "may not insist to impasse on the issue and then seek a resolution of the impasse by the Federal Service Impasses Panel." Id. at 740.
 
 
 10
 The FLRA disagreed, and dismissed the union's complaint. The Authority relied on the Act's definition of "conditions of employment" and the scheme of the legislation to support its conclusion that the scope of a grievance procedure is a mandatory subject of bargaining, a subject on which a party is entitled to bargain to impasse. Id. at 740-42. As a final point, the FLRA stated: "Consistent with the intent of Congress expressed in the Statute and its pertinent legislative history, a party proposing to narrow the scope of the grievance procedure bears the burden in Panel proceedings to justify the proposed reduction in the scope of the grievance procedure." Id. at 742.
 
 C. The three contested FLRA decisions
 
 11
 The Local 3723 --Navy Negotiations.[11] --In November 1978, AFGE Local 3723 and the United States Department of the Navy commenced negotiations on a new collective bargaining agreement. The Navy proposed a limited scope agreement that would have excluded from the negotiated grievance procedure Navy decisions not to select an employee for promotion, decisions to terminate temporary employment, Navy interpretations of its regulations, and about ten other subjects.
 
 
 12
 AFGE insisted on a broad scope agreement, and refused to negotiate the matter with the Navy. AFGE initially took the position that it "would not discuss any exclusions beyond those quoted in the [Statute]."[12] Later, it stated it "would discuss the management proposal but would not negotiate it."[13] The Union now characterizes its refusal to bargain with the Navy as "less than outright." Brief of Petitioner at 41.
 
 
 13
 The Navy filed an unfair labor practice charge with the FLRA in May 1979, alleging that the Union had violated the Act's requirement that the parties negotiate in good faith. An Administrative Law Judge agreed with the Navy. Citing Vermont Guard, the Authority upheld the decision on appeal.
 
 
 14
 The Local 225 --ARDC Negotiations.[14] --The United States Department of the Army, U.S. Army Armament Research and Development Command ("ARDC") and AFGE Local 225 began negotiating a new collective bargaining agreement in September 1979. The ARDC proposed that the new agreement exclude twenty-one matters from the grievance procedure. Throughout the negotiations, AFGE "maintained its position that it would neither consider nor discuss any exclusions beyond those required by the Statute."[15] The ARDC filed a complaint with the FLRA. Relying on Vermont Guard, the Authority ruled that the Union had committed an unfair labor practice.
 
 
 15
 The Local 1504 --Fort Lewis Negotiations.[16] --The United States Department of the Army, Fort Lewis, and AFGE Local 1504 commenced negotiations on a new collective bargaining agreement in March 1979. Fort Lewis proposed a limited scope grievance procedure; AFGE favored one of broad scope. The parties discussed their respective positions but ultimately failed to reach an accord. Fort Lewis suggested reference of the matter to the Federal Service Impasses Panel; AFGE rejected Panel involvement. AFGE and the FLRA's General Counsel charged Fort Lewis with an unfair labor practice. Again relying on Vermont Guard, the FLRA ruled that Fort Lewis' insistence on bargaining to impasse over the scope of the grievance procedure did not violate the Act.
 
 II. DISCUSSION
 
 16
 Congress has entrusted to the FLRA primary responsibility for administering and enforcing the Federal Service Labor-Management Relations Act. An FLRA interpretation of the Act, if reasonable and coherent, commands our respect. See Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 37-40, 102 S.Ct. 38, 44-46, 70 L.Ed.2d 23 (1981); NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75, 94 S.Ct. 1757, 1761-62, 40 L.Ed.2d 134 (1974). This court has several times so acknowledged. See, e.g., Department of Defense v. FLRA, 685 F.2d 641, 648 (D.C.Cir.1982); Department of Defense v. FLRA, 659 F.2d 1140, 1153 & n. 74 (D.C.Cir.1981), cert. denied, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982); National Federation of Federal Employees v. FLRA, 652 F.2d 191, 193 (D.C.Cir.1981).[17]
 
 
 17
 The matter of statutory construction before us is perplexing; it might be resolved, reasonably, in ways other than the one advanced by the FLRA. As a court of review, however, we are not positioned to choose from plausible readings the interpretation we think best. Rather, our task is to inquire whether the FLRA's reading is sufficiently plausible and reasonable to stand as the governing law, absent alteration by Congress. See NLRB v. Transportation Management Corp., --- U.S. ----, ----, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983) (NLRB's reasonable construction is entitled to deference when it is a permissible, albeit not required, interpretation of the Act NLRB administers); see also Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); Train v. Natural Resources Defense Council, 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975).
 
 
 18
 The record and arguments in these cases present three views on what the Act instructs regarding the process of bargaining over grievance procedure scope.
 
 
 19
 The FLRA contends that scope is a mandatory subject of bargaining: both parties must be prepared to entertain limited scope proposals, either party may insist on its position to impasse. An impasse on scope, like any other impasse, may be brought to the Panel for resolution. But scope is unusual, the FLRA acknowledges, because the Act indicates broad scope grievance procedures as the standard arrangement. Therefore the Panel must recognize a presumption in favor of broad scope. The party seeking to limit scope bears the burden of persuading the Panel that the standard arrangement should be displaced by one more reasonable in a particular setting.
 
 
 20
 In the Union view, the Act classifies scope as an entirely permissive subject of bargaining. A party may present its proposal to limit scope at the bargaining table, but the opposing party may reject the proposal out of hand and demand a broad scope provision. If that occurs, the proponent of a limited scope procedure must recede. The Panel should never have occasion to resolve an impasse triggered by a disagreement over scope; if the matter does reach the Panel, the Panel is bound to impose a broad scope procedure.
 
 
 21
 The FLRA's General Counsel tendered the position that parties are required to "discuss" scope, but may not press the matter to impasse.[18] When one party proposes a limited scope agreement, the other must give the proposal "good faith consideration."[19] "Once good faith consideration has occurred, either party may request the broad scope grievance procedure under the Statute consistent with good faith bargaining."[20] The Statute thus "permit[s] some consideration and discussion of alternatives regarding the scope of the grievance procedure during negotiations, but absent agreement, the requested broad scope takes effect."[21] Neither party may "reach impasse or utilize dispute resolution processes" with regard to scope, "because Congress has already stated the outcome where mutual agreement is not achieved."[22] Again, the question of scope should never reach the Panel; if it does, the Panel must decide in favor of a broad scope agreement.
 
 
 22
 Our inquiry indicates that each of these positions is a plausible interpretation. The text of the Act affords support for the FLRA's approach; the legislative history, a cloudy indicator here, provides some support for the Union's or the General Counsel's. On balance we cannot say that the FLRA's construction of the Act is wrong.
 
 
 23
 The FLRA ties to the Act's language and design its view that grievance procedure scope is a mandatory subject of bargaining:
 
 
 24
 (1) The collective bargaining mandated by the Act requires parties "to consult and bargain in a good-faith effort to reach agreement with respect to the conditions of employment ...." 5 U.S.C. § 7103(a)(12).
 
 
 25
 (2) "Conditions of employment" are defined as "personnel policies, practices, and matters ... affecting working conditions ...." 5 U.S.C. § 7103(a)(14).
 
 
 26
 (3) Procedures for settling grievances relate to "conditions of employment." "Grievances" encompass employee or union complaints "relating to the employment of [any] employee," and complaints by employee, union, or agency regarding violations of law or regulations that "affect[ ] conditions of employment." 5 U.S.C. § 7103(a)(9).
 
 
 27
 (4) The scope of a grievance procedure is thus a condition of employment, and therefore a mandatory subject of bargaining unless classified otherwise by another section of the Act.
 
 
 28
 (5) Section 7121(a), the only provision of the Act that directly addresses grievance procedure scope, does not say scope should be treated as anything other than a mandatory subject of bargaining.
 
 
 29
 The Union and the FLRA's General Counsel apparently agree with every step of this argument but the last. We turn, therefore, to the two paragraphs of section 7121(a). They are less than crystalline. The first reads, in relevant part:
 
 
 30
 (1) Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability.
 
 
 31
 5 U.S.C. § 7121(a)(1). This paragraph's reach evidently depends on the breadth of "grievances," a term the Act defines expansively in section 7103(a)(9), see supra note 8. Paragraph (2) of section 7121(a) states:
 
 
 32
 (2) Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement.
 
 
 33
 5 U.S.C. § 7121(a)(2).
 
 
 34
 The FLRA argues that section 7121(a) not only fails to withdraw scope from mandatory bargaining, it affirmatively supports the view that scope is bargainable: since the parties' "collective bargaining agreement may exclude any matter" from the scope of the grievance procedure, their negotiations must address the question of scope. The Union reads section 7121(a) to say the opposite: if something "may" be excluded, it "may," but need not, be bargained. Neither contention carries the day. The "may" in Paragraph (2) indicates that contract provisions narrowing the scope of grievance procedures are not forbidden; that paragraph says nothing about the process of negotiation for those contract provisions. Use of "shall" rather than "may" in Paragraph (2) would make no sense;[23] Congress' use of the latter term thus holds no special significance.
 
 
 35
 The Union's next text-based argument is that Paragraph (2) requires "agreement" by the parties before the scope of the grievance procedures may be narrowed. Since either party has the unilateral power not to "agree," the Act, according to the Union (and the FLRA's General Counsel), gives either party an absolute, nonnegotiable right to a broad scope provision. A resolution imposed on the parties by the Federal Service Impasses Panel, the Union maintains, cannot qualify as an "agreement" under the Act. Bargaining to impasse therefore cannot lawfully yield anything but a broad scope grievance procedure. Thus there can be no genuine impasse, and no dispute for the Panel to resolve.
 
 
 36
 One answer to this argument is that both paragraphs of section 7121(a) refer to terms of a "collective bargaining agreement." If a Panel-imposed settlement is not deemed an "agreement" for the purposes of Paragraph 7121(a)(2), then such a settlement should not count as an "agreement" that engages Paragraph 7121(a)(1). Under the Union's conception of Panel resolutions, section 7121(a) should be suspended in its entirety once matters reach the Panel; the Panel would then have more--not less--leeway as to the settlement it may impose than the FLRA maintains it has.[24] (The FLRA, we recall here, said the Panel must start with a presumption favoring broad scope.)
 
 
 37
 Countering the Union's view that section 7121(a) defines a permissive subject of bargaining, the FLRA contrasts that section with section 7106,[25] a provision of the Act that identifies several permissive subjects of bargaining in terms that leave no room for misunderstanding. Section 7106(a) explicitly designates certain itemized subjects as management rights. Paragraph (1) of section 7121(a), in contrast, does not speak of union rights; it describes in neutral terms a clause that must be included in every collective bargaining agreement. Section 7106(b)(1) explicitly permits negotiation "at the election of the agency"; Paragraph (2) of section 7121(a), again in neutral language, permits grievance procedure scope to be narrowed in "[a]ny collective bargaining agreement."[26]
 
 
 38
 We agree that the comparison of section 7106 with section 7121(a) is telling. At a minimum, section 7106 demonstrates that Congress knew how to write a provision defining permissive subjects of bargaining unambiguously. Moreover, Congress linked the permissive subjects of bargaining to unilateral rights specifically vested in one party.[27] Section 7121(a) is simply not cast in the same mold; it is not designated a union rights clause and it labels no subject bargainable at a party's election.
 
 
 39
 The Union argues, however, that the meaning of section 7121(a) becomes clear on inspection of a page from the legislative history. Congressman William Ford, a member of the House-Senate Conference Committee that formulated the final version of section 7121(a), emphatically stated that scope is a "permissible" subject of bargaining: a union may negotiate on scope "at its option"; an agency, on the other hand, "may not insist to impasse that the union agree to a reduced scope of grievances under the negotiated procedure."[28] These remarks fully support the Union's position; they might be dispositive, but for the fact that they were made one day after the Act was signed into law. It is settled that courts construing statutory language should give little weight to post-enactment statements by members of Congress.[29]
 
 
 40
 The Act's language and the pre-enactment legislative history offer slim, if any, support for Congressman Ford's post-enactment declaration. Prior to the 1978 enactment of the Federal Service Labor-Management Relations Act, federal labor-management practices were governed by successive Presidential Executive Orders under which the scope of grievance procedures was left largely to the bargaining process.[30] The Senate bill would have codified that hands-off approach.[31] Under the House bill,[32] however, parties were allowed no discretion to negotiate a limited scope procedure.[33] The provision finally enacted by Congress was an attempt at a compromise. The Conference Report stated:
 
 
 41
 The Senate provides that the coverage and scope of the grievance procedures shall be negotiated by the parties .... House section 7121(a) does not authorize the parties to negotiate over the coverage and scope of the grievances that fall within the bill's provisions but prescribes those matters which would have to be submitted, as a matter of law, to the grievance procedures. The conference report follows the House approach with an amendment. All matters that under the provisions of law could be submitted to the grievance procedures shall in fact be within the scope of any grievance procedure negotiated by the parties unless the parties agree as part of the collective bargaining process that certain matters shall not be covered by the grievance procedures.
 
 
 42
 Joint Explanatory Statement of the Committee on Conference, H.R.Rep. No. 95-1717, 95th Cong., 2d Sess. 157 (1978), U.S.Code Cong. & Admin.News 1978, 2723, 2891.
 
 
 43
 The Conference Report explanation does little to clarify the will of the legislature. The conferees purported to "follow[ ] the House approach." But they also accepted limited scope agreements arrived at "as part of the collective bargaining process," precisely what the Senate bill contemplated. The opacity of the compromise is unsurprising: it is difficult to locate a sensible middle ground between the House and Senate versions of section 7121(a).
 
 
 44
 If grievance procedure scope is a permissive subject of bargaining, the Conference Committee gave unions more than even the House bill would have provided. Classifying scope as a permissive subject of negotiation would allow unions flatly to refuse to negotiate scope--just as they might have under the House bill--or freely to use scope as a bargaining chip, to be traded for other employee benefits--something the House bill would not have allowed. It seems unlikely that the Conference Committee would have agreed to a "compromise" more favorable to unions than the approach taken by either chamber's bill.[34]
 
 
 45
 The General Counsel's position, that parties must "discuss" but may not bargain to impasse on scope, is a plausible attempt to balance the House and Senate approaches. But like the Union's position, the General Counsel's draws no strength from the language of section 7121(a). Moreover, we see scant utility in defining a new, intermediate standard of good-faith negotiation--a standard prohibiting outright refusals to bargain but allowing something less than full bargaining, a standard, moreover, applicable only to a limited class of subjects that includes, but is perhaps not limited to, grievance procedure scope. Such an intermediate standard of negotiation would promote "going through the motions" at the bargaining table, and would inevitably spawn litigation to distinguish issues that must be bargained from those that must be "discussed" but need not be bargained all the way.[35] The FLRA and the courts would contribute little to the effectiveness or fairness of collective bargaining under the Act by resolving such disputes; the parties would gain little by litigating them.[36] The duty to bargain "does not compel either party to agree to a proposal or to make a concession." 5 U.S.C. § 7103(a)(12). If a party must "discuss" a subject, it can "bargain" it.
 
 
 46
 In sum, the Union's appeal to the legislative history is plausible, but not so persuasive that it impels us to reject the FLRA's different construction of the Act. The position advocated by the General Counsel also reflects a reasoned attempt to find a middle ground between the House and Senate positions, but the FLRA's decision not to accept it is equally resistant to a reviewing court's veto. The Act securely establishes that all "conditions of employment" are presumed to be mandatory subjects of bargaining, and does not clearly indicate that grievance procedure scope is to be treated otherwise. An ambiguous legislative history, particularly one that relies largely on a legislator's post-enactment statement, will not suffice to displace the FLRA's reasonable construction of the Act's language.[37]
 
 
 47
 The FLRA has correctly recognized that section 7121(a) singles out grievance procedures for special attention. The first part of the section indicates a broad scope grievance procedure as the standard arrangement, but the second part permits the parties to negotiate limited scope agreements in the course of bargaining. The FLRA's reading of section 7121(a) is an acceptable attempt to formulate an approach consistent with the section's two-part structure, and with the House-Senate differences that appear to account for it. Under the Authority's construction, scope is a mandatory subject of bargaining, but if impasse is reached on this subject the Federal Service Impasses Panel is to impose a broad scope grievance procedure unless the limited-scope proponent can persuade it to do otherwise. We would expect the Panel, in view of the FLRA's decision and the foregoing analysis, to rule against a proponent of a limited procedure who fails to establish convincingly that, in the particular setting, its position is the more reasonable one.
 
 III. CONCLUSION
 
 48
 For the reasons stated, we affirm the FLRA's dismissal of the unfair labor practice complaint brought against Fort Lewis, and affirm the FLRA's rulings that AFGE committed unfair labor practices in its negotiations with the Navy and the ARDC.
 
 
 
 [1]
 5 U.S.C. § 7116(a)(5), (b)(5)
 
 
 [2]
 5 U.S.C. § 7105(a)(2)(G)
 
 
 [3]
 5 U.S.C. § 7119(c)(5)(B)(iii), (c)(5)(C)
 
 
 [4]
 5 U.S.C. § 7116(a)(6), (b)(6). Panel decisions are reviewable, first by the Authority, then in court in an unfair labor practice proceeding. See Department of the Treasury v. FLRA, 707 F.2d 574 at 577 n. 7 (D.C.Cir.1983)
 
 
 [5]
 5 U.S.C. § 7121(a)(1)
 
 
 [6]
 5 U.S.C. § 7121(b)
 
 
 [7]
 5 U.S.C. § 7121(b)(3)(C)
 
 
 [8]
 "[G]rievance" means any complaint--
 (A) by any employee concerning any matter relating to the employment of the employee;
 (B) by any labor organization concerning any matter relating to the employment of any employee; or
 (C) by any employee, labor organization, or agency concerning--
 (i) the effect or interpretation, or a claim of breach, of a collective bargaining agreement; or
 (ii) any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment ....
 5 U.S.C. § 7103(a)(9).
 
 
 [9]
 The [subsections mandating a grievance procedure] shall not apply with respect to any grievance concerning--
 (1) any claimed violation of subchapter III of chapter 73 of this title (relating to prohibited political activities);
 (2) retirement, life insurance, or health insurance;
 (3) a suspension or removal under section 7532 of this title;
 (4) any examination, certification, or appointment; or
 (5) the classification of any position which does not result in the reduction in grade or pay of an employee.
 5 U.S.C. § 7121(c).
 
 
 [10]
 The General Counsel investigates unfair labor practice charges and may press complaints on behalf of parties before the FLRA. See 5 U.S.C. § 7118(a)(1)
 
 
 [11]
 AFGE Local 3723, AFL-CIO and United States Dep't of the Navy, 9 FLRA 744 (1982)
 
 
 [12]
 Id. at 750, Finding of Fact # 7
 
 
 [13]
 Id., Finding of Fact # 9
 
 
 [14]
 AFGE Local Union 225 and U.S. Dep't of the Army, U.S. Army Armament Research & Dev. Command, 9 FLRA 758 (1982)
 
 
 [15]
 Id. at 759
 
 
 [16]
 United States Dep't of the Army, Fort Lewis and AFGE Local 1504, 9 FLRA 855 (1982)
 
 
 [17]
 If an agency construes its charter erratically or inconsistently, however, little or no deference will be owed to its decisions. Adamo Wrecking Co. v. United States, 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (consistency of an agency's reasoning bears on deference to be given to its ruling). AFGE attempts to persuade us that a prior FLRA pronouncement, Interpretation and Guidance, 2 FLRA 273 (1979), is inconsistent with the Authority's decisions in Vermont Guard and the three cases under review here. In the Interpretation in question the FLRA stated that the scope of a grievance procedure incorporated in an agreement remains in effect until the parties agree to narrow it. This statement need not be read as inconsistent with the view that scope "must" be bargained. The parties' duty to bargain over matters in dispute is readily distinguished from the freedom they retain ultimately to accept or reject any particular clause either proposes. See also infra, p. 646 & n. 24
 
 
 [18]
 See Counsel for the General Counsel's Brief to the Federal Labor Relations Authority, filed with the FLRA as part of the Fort Lewis decision, J.A. 34, 41, 43 (Nov. 14, 1980)
 
 
 [19]
 Id
 
 
 [20]
 Id., J.A. 41-41a
 
 
 [21]
 Id., J.A. 41 (emphasis in original)
 
 
 [22]
 Id., J.A. 43
 
 
 [23]
 Section 7121(c) does say that certain subjects "shall" be excluded; the exclusion of those subjects is therefore a prohibited--not a mandatory--subject for bargaining
 
 
 [24]
 We are, however, convinced that a Panel-imposed settlement, once adopted by the parties, should be regarded as part of a "collective bargaining agreement," and therefore subject to the constraint imposed by Paragraph 7121(a)(1) but free to reflect the flexibility afforded by Paragraph 7121(a)(2). The Act defines a "collective bargaining agreement" as "an agreement entered into as a result of collective bargaining pursuant to the provisions of this chapter," 5 U.S.C. § 7103(a)(8), provisions which include those empowering the Panel to resolve impasses. Appeal to the Panel is the public sector alternative to resolving disputes through collective action, and as such is an integral part of the process of collective bargaining under the Act. In the same vein, § 7119(c)(5)(C) states that Panel "action shall be binding on [the] parties during the term of the agreement " (emphasis supplied); the Act apparently assumes here, as elsewhere, that a Panel resolution is to be treated as part of an "agreement."
 The Act is built around collective negotiation of, adherence to, and enforcement of "agreements"; for administration and enforcement purposes, it nowhere distinguishes "agreements" from Panel-imposed settlements. It is an unfair labor practice for agencies to enforce any rule or regulation "in conflict with any applicable collective bargaining agreement." 5 U.S.C. § 7116(a)(7). And a union's right of exclusive representation extends to "negotiat[ing] collective bargaining agreements." 5 U.S.C. § 7114(a)(1). If Panel-imposed settlements were not embraced by the term "collective bargaining agreements," union rights to enforce contracts and represent employees might be significantly curtailed, and the operation of the Act as a whole would be undermined.
 
 
 [25]
 Section 7106(a) states that "nothing in this chapter shall affect the authority of any management official of any agency--(1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency ...." Section 7106(b) then adds: "Nothing in this section shall preclude any agency and any labor organization from negotiating--(1) at the election of the agency, on the numbers, types, and grades of employees ...." (Emphasis supplied.)
 
 
 [26]
 Section 7106 was extensively debated in the House, and members gave close scrutiny to its likely effect on the delicate balance between labor and management struck by the Act. See 124 Cong.Rec. 29,195-99 (1978). In response to a question, Congressman William Ford explained precisely the effect of defining management rights as only permissive subjects of bargaining. Id. at 29,195-96. Section 7121(a) received much less attention. There is no indication that House members viewed it as significantly affecting the labor-management balance
 
 
 [27]
 It is sensible to view all matters relating to conditions of employment as mandatory subjects of bargaining unless the Act explicitly or by unambiguous implication vests in a party an unqualified "right." A "right" is a logical candidate for a permissive subject of bargaining, one that a party may--but need not--put on the bargaining table. Thus, subjects falling within the ambit of section 7106 (which defines management rights) or sections 7102 and 7114 (which define employees' rights and unions' rights of representation) should be "permissive" subjects of bargaining; other "conditions of employment" are appropriately ranked in the mandatory category. Both AFGE and U.S. Air Force Logistics Command, 4 FLRA No. 39 (Sept. 26, 1980), the only FLRA case recognizing a permissive subject of bargaining, and NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), the leading private sector opinion addressing permissive subjects, appear to be consistent with this approach. See also National Fed'n of Fed. Employees v. FLRA, 652 F.2d 191 (D.C.Cir.1981) (number of representatives chosen by management to conduct its side of bargaining not a mandatory subject)
 
 
 [28]
 The relevant part of Congressman Ford's statement reads:
 Although the basic House approach of stating in the statute the scope of the [negotiated grievance] procedure was followed, the conferees also adopted a provision aimed solely at allowing the exclusive representative, at its option, to propose and agree to a reduced coverage for the negotiated grievance procedure--perhaps for financial reasons. Of course, the union may also negotiate changes in the appeals procedure to the extent that the agency has the authority to revise that procedure, instead of replacing the appeals with a negotiated procedure.
 We can analogize this situation to management's "permissible" areas of bargaining under section 7106(b)(1), except that permitting the reduction in the scope of the grievance procedure was included in the conference report as a means to insure union flexibility. That is, the union is free to withdraw that proposal at any time, and is free to insist to impasse on the narrowed scope if the agency does not agree. An agency, however, may not insist to impasse that the union agree to a reduced scope of grievances under the negotiated procedure. The unions do not have to negotiate in those statutory appeals that will be replaced by a grievance and arbitration procedure; they may negotiate out certain or all of these appeals.
 
 
 [124]
 Cong.Rec. 38,717 (1978)
 
 
 [29]
 Regional Rail Reorg. Act Cases, 419 U.S. 102, 132, 95 S.Ct. 335, 352, 42 L.Ed.2d 320 (1974); National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 639 n. 34, 87 S.Ct. 1250, 1265 n. 34, 18 L.Ed.2d 357 (1967)
 This court cited Congressman Ford's post-enactment statement in at least one prior case. In National Fed'n of Fed. Employees v. FLRA, 652 F.2d 191, 193 (1981), we quoted Congressman Ford on the deference owed by the courts to the FLRA. That case, however, involved no apparent conflict between Congressman Ford's views and the language of the Act, and there was no indication that the Senate had differed from the House on the question the Congressman addressed. Moreover, this court recognized that the Congressman's statement was "not controlling." Id. AFGE Local 2782 v. FLRA, 702 F.2d 1183, 1187 (D.C.Cir.1983), also quoted Congressman Ford's views, but the quotation was from his preenactment statements.
 
 
 [30]
 Executive Order 10988, [1959-1963 Compilation] 3 C.F.R. 521, 525 (1962); Executive Order 11491, [1966-1970 Compilation] 3 C.F.R. 861, 870 (1969), as amended, [1971-1975 Compilation] 3 C.F.R. 605 (1971), [1971-1975 Compilation] 3 C.F.R. 957 (1975); reprinted in 5 U.S.C. § 7101 note, at 312-17 (Supp. V 1981)
 
 
 [31]
 See S.Rep. No. 95-969, 95th Cong., 2d Sess. 109-10 (1978), U.S.Code Cong. & Admin.News 1978, 2723, 2831 ("[A]n agreement must contain a procedure for the consideration of grievances. The coverage and scope of the [grievance] procedure is left to negotiation between the parties so long as it does not conflict with [the] statute....")
 
 
 [32]
 See H.R.Rep. No. 95-1403, 95th Cong., 2d Sess. 55 (1978) ("[A]ny collective bargaining agreement entered into by an agency and a labor organization must contain procedures for the settlement of grievances, including questions of arbitrability.")
 
 
 [33]
 During the House debate at least two members questioned the desirability of this approach. Congressman Frenzel urged the House to "revert to the time-tested Executive order"; Congressman Derwinski stated his preference for "the President's Executive order, which was in fact the action taken in the Senate." 124 Cong.Rec. 28,797 (1978)
 
 
 [34]
 Section 7121(a), as earlier observed, is equivocal. It is phrased neutrally, and does not, by its terms, confer any unilateral rights on employees or unions. In this light, the Conference Committee's adoption of Paragraph 7121(a)(2) has the appearance of a real compromise. But historically, grievance procedure clauses have been labor's quid pro quo for no strike clauses. See B. Meltzer, Labor Law 762 (2d ed. 1977). The Act precludes federal employees from participating in strikes, work stoppages, or slowdowns, 5 U.S.C. § 7116(b)(7); the grievance procedure provision thus may be Congress' reciprocal concession to employees
 
 
 [35]
 Accordingly, we reject the Union's argument that it committed no unfair labor practice in the Local 3723 negotiations because its conduct was "less than an outright refusal to bargain." Brief of Petitioner at 41. In those negotiations the Union did state its willingness to "discuss"--but insisted it would not "negotiate"--the scope of the grievance procedure. See supra p. 642 & note 13
 
 
 [36]
 In the House debate on section 7106, which itemizes certain "management rights" that may be negotiated only "at the election of the agency," Congressman Ford stated:
 [I]t is hoped that the Federal Labor Relations Authority will oversee a flexible Federal labor-management program responsive to changing and particularized circumstances. The concept of negotiability is and must be a dynamic and growing one. If not, Federal sector labor relations must fail because the energies of management and labor will be diverted from consideration of important labor relations problems to the litigation of the scope of the exceptions to the general bargaining obligation. Years of public and private sector collective bargaining indicate this should not happen.
 
 
 [124]
 Cong.Rec. 29,199 (1978). Although section 7106 does identify certain permissive subjects of bargaining, the House Report stated that the section should "be read to favor collective bargaining whenever there is doubt as to the negotiability of a subject or a proposal." H.R.Rep. No. 95-1403, supra note 32, at 44. See also AFGE Local 2782 v. FLRA, 702 F.2d 1183 (D.C.Cir.1982)
 
 
 [37]
 Cf. United States Dep't of Justice v. FLRA, 709 F.2d 724 at 728, No. 82-1622 slip op. at 10 (D.C.Cir. June 10, 1983) ("The union proposal ... would provide precisely what Congress would not."). See generally 128 Cong.Rec. S8659 (daily ed. July 19, 1982) (remarks of Senator Armstrong criticizing excessive judicial reliance on legislative history)